## D. C. KNAPP v. MINNEAPOLIS, ST. PAUL, & SAULT STE. MARIE RAILWAY COMPANY, a Corporation.

(159 N. W. 81.)

**Common carrier — transportation with respect to — property — obligations — commerce with its delivery to carrier — acceptance — for transportation.**

  1. A common carrier's duties and obligations with respect to the transporta-

---

Note.—Upon the question of liability of connecting carrier for loss beyond its own line, see note in 31 L.R.A. (N.S.) 1, referred to in dissenting opinion of case above.

The question of liability of receiving carrier for loss beyond its own line is also discussed in a note in 42 Am. Rep. 664.

tion of property commence with its delivery to and acceptance by him for that purpose.

**Statutory rule — absence of — express stipulations — between parties — carrier — liability — bill of lading — owners of goods — complete delivery for transportation.**

2. In absence of a statutory rule, or express stipulation between the parties, the carrier's primary liability does not depend upon whether a bill of lading has been issued, but upon whether there has been a complete delivery by the owner of the goods to the carrier for the purpose of transportation.

**Bill of lading — receipt — delivery — not essential to — agent — evidence — proof of delivery.**

3. A bill of lading or other receipt is not ordinarily essential to a complete delivery, but such instrument, when issued by an authorized agent of a carrier, is always competent evidence tending to prove that the property therein described was delivered to such carrier for shipment.

**Bill of lading — receipt — contract — construction — different rules.**

4. A bill of lading is at once a receipt and a contract. In its twofold character of receipt and contract, the bill of lading is subject to different rules of construction. In so far as it is merely a receipt, either party may explain or contradict it by parol evidence but as a contract it must be construed according to its terms.

**Interstate commerce act — Carmack amendment — carriers — interstate transportation — receiving property for — loss — injury — beyond own lines — preceding carriers — liability.**

5. The Carmack amendment to the Interstate Commerce Act makes a carrier who receives property for interstate transportation liable for loss or injury to such property beyond its own lines, but it does not make a carrier liable for the acts of preceding carriers, which may have resulted in loss of or injury to such property.

**Local station agent — authority of — express or implied — contract of transportation — from places distant from such station — preceding carrier — acts of.**

6. A local station agent, as such, has no power, without further authorization, express or implied, to bind his company by a contract to transport goods from places distant from such station and distant from defendant's line of railway; nor has such agent any authority to assume liability for acts of a preceding carrier.

**Grain — value of — action to recover — common carrier — loss of grain — preceding carrier — while in possession of — defendant — not liable — special agreement — assumed responsibility — evidence.**

7. Where plaintiff sues defendant for the value of certain grain alleged to

have been lost through defendant's negligence, while such grain was in the custody and under the control of, and upon certain boats owned and operated by, the defendant as a common carrier; and where the evidence shows that such grain was lost while in the possession of a preceding carrier and before the shipment had been delivered to or received by defendant, the plaintiff cannot be permitted to introduce evidence tending to show, or recover upon the theory, that the defendant, by special agreement, had assumed responsibility for the safety of such shipment while in custody of, and being transported by, such preceding connecting carrier.

Opinion filed July 22, 1916.

Appeal from the judgment of the District Court of Burke County, *Buttz,* Special Judge.  Defendant appeals.

Reversed.

*Palda, Aaker, & Greene (Alfred H. Bright* and *John L. Erdall,* of counsel), for appellant.

"The duties and obligations of the common carrier with respect to the goods commence with their delivery to him; this delivery must be complete, so as to put upon him the exclusive duty of seeing to their safety.  The law will not divide the duty or the obligation between the carrier and the owner of the goods and until it has become imposed upon the carrier by a delivery and acceptance, he cannot be held responsible for loss.  Hutchinson, Carr. 3d ed. § 105; Missouri P. R. Co. v. McFadden, 154 U. S. 155, 38 L. ed. 944, 14 Sup. Ct. Rep. 990; Gass v. New York, P. & B. R. Co. 99 Mass. 220, 96 Am. Dec. 742.

"Where several connecting carriers establish and publish joint or through rates, that fact alone will not be sufficient to impose upon them a joint liability or render one of them responsible for the acts or omissions of the others."  1 Hutchinson, Carr. §§ 262, 263; Peterson v. Chicago, R. I. & P. R. Co. 80 Iowa, 92, 45 N. W. 573; Pennsylvania R. Co. v. Jones, 155 U. S. 333, 39 L. ed. 176, 15 Sup. Ct. Rep. 136; Wehmann v. Minneapolis, St. P. & S. Ste. M. R. Co. 58 Minn. 22, 59 N. W. 546.

*F. B. Lambert* and *Geo. A. Gilmore,* for respondent.

"Whether an agent acted within the scope of his authority is a question of fact," and "agency and authority of agents are questions of fact."  1 Sutherland, Code Pl. Pr. & Forms, § 1127.

"Except as against the strict prohibitions of the Interstate Commerce Act, railroads may contract to do their business, or help such business, in the same manner and to the same extent as any other corporation." Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 40 L. ed. 935, 5 Inters. Com. Rep. 391, 16 Sup. Ct. Rep. 700; Interstate Commerce Commission v. Baltimore & O. R. Co. 145 U. S. 263, 36 L. ed. 699, 4 Inters. Com. Rep. 92, 12 Sup. Ct. Rep. 844.

Such corporations, unless forbidden by their charters, have the power to contract for shipments the entire distance over any connecting lines. Ogdensburg & L. C. R. Co. v. Pratt, 22 Wall. 123, 22 L. ed. 827; Great Western R. Co. v. Blake, 7 Hurlst. & N. 987, 31 L. J. Exch. N. S. 346, 8 Jur. N. S. 1013, 10 Week. Rep. 388; Buxton v. Northeastern R. Co. L. R. 3 Q. B. 549, 9 Best. & S. 824, 37 L. J. Q. B. N. S. 258, 18 L. T. 795, 16 Week. Rep. 1124; Weed v. Saratoga & S. R. Co. 19 Wend. 534; Knight v. Portland, S. & P. R. Co. 56 Me. 234, 96 Am. Dec. 449; Ohio & M. R. Co. v. McCarthy, 96 U. S. 258, 264, 24 L. ed. 693, 695; 1 Hutchinson, Carr. §§ 226, 228.

"An agent employed to solicit freight traffic has the implied authority to bind his principal for safe delivery at a point beyond his own line, and to contract over which road beyond such line the property shall be transported. Freemont, E. & M. Valley R. Co. v. New York, C. & St. L. R. Co. (Union State Bank v. Fremont, E. & M. Valley R. Co.) 66 Neb. 159, 59 L.R.A. 939, 92 N. W. 131.

"Where there was competent evidence before the jury that the railroad company undertook to carry property beyond its own line, and the jury have found such to be a fact, the other companies are deemed to be agents, for whose faults it is responsible. Ogdensburg & L. C. R. Co. v. Pratt, 22 Wall. 123, 22 L. ed. 827.

"The giving and issuing of a receipt or bill of lading for the property to be transported to a place beyond the terminus of the road of the common carrier are evidence of a contract of such common carrier to transport such property to the place of destination. This prima facie case of the statute makes for the plaintiff on the facts stated." McCann v. Eddy, 133 Mo. 59, 35 L.R.A. 110, 33 S. W. 71; Galveston, H. & S. A. R. Co. v. Wallace, 223 U. S. 481, 56 L. ed. 516, 32 Sup. Ct. Rep. 205.

"A railroad company has power and the right to contract as a common carrier to transport freight through another state, over another railroad beyond its own line." Michigan C. R. Co. v. Mineral Springs Mfg. Co. 16 Wall. 318, 21 L. ed. 297; Ohio & M. R. Co. v. McCarthy, 96 U. S. 259, 24 L. ed. 693; Merchants' Dispatch Transp. Co. v. Bloch Bros. 86 Tenn. 392, 6 Am. St. Rep. 847, 6 S. W. 881.

Therefore, if a railroad or other transportation company can so contract, then, by analogy, it can contract and bind itself to be liable for damages on connecting railroads or lines, when such damages occur prior to its getting possession of the goods. Swift v. Pacific Mail S. S. Co. 106 N. Y. 206, 12 N. E. 583; Weed v. Saratoga & S. R. Co. 19 Wend. 534; Wylde v. Northern R. Co. 53 N. Y. 156, 5 Am. Neg. Cas. 189; Root v. Great Western R. Co. 45 N. Y. 524; Condict v. Grand Trunk R. Co. 54 N. Y. 500.

"A carrier which, by contract or by usage, solicits a compress company as its agent to receive cotton that is to be shipped over its road, and issues bills of lading therefor on presentation of the compress company's receipt, is in possession of the cotton when the bill of lading has been executed so as to be liable for the loss by fire." Deming v. Merchants' Cotton-Press & Storage Co. 90 Tenn. 306, 13 L.R.A. 518, 17 S. W. 89.

"A general western agent is held to have authority to bind the railroad company by special contract." Northern P. R. Co. v. American Trading Co. 195 U. S. 439, 49 L. ed. 269, 25 Sup. Ct. Rep. 84; Thompson v. San Antonio & A. P. R. Co. 11 Tex. Civ. App. 145, 32 S. W. 427.

"A carrier may even contract to receive freight at a point not on its own line, so as to be liable for the negligence of the prior carrier." Noyes v. Rutland & B. R. Co. 27 Vt. 110.

CHRISTIANSON, J. This is an action to recover damages for certain wheat which plaintiff asserts he delivered, and defendant as a common carrier received, for the purpose of transportation; and which wheat, plaintiff asserts, was lost by reason of the negligence of the defendant and its employees, while in the possession and under the control of the defendant. The case was tried to a jury; a verdict was

returned in favor of the plaintiff, and defendant has appealed from the judgment entered upon the verdict.

The principal question presented on this appeal is whether plaintiff's cause of action was established. This question in turn involves a consideration of the issues raised by the pleadings and the admissibility of evidence thereunder.

Plaintiff's complaint alleges:

"1. That the defendant, at all of the times hereinafter mentioned, was, and since said dates has been and now is, a foreign corporation organized and existing under and by virtue of the laws of the state of Minnesota, and engaged in the owning, operating, and running of a line of railway from the city of Minneapolis, Minnesota, to Portal, North Dakota, as well as a line of boats on Des Lacs lake, a small inland waterway, extending from Kenmare, North Dakota, a small distance into the Province of Saskatchewan, Canada, and as such railway corporation engaged as a transportation company and inland common carrier of freight and passengers.

"2. That between the 25th day of September, 1910, and the first day of November of the same year, the defendant received from the plaintiff twelve (12) carloads of bulk wheat for transportation, eight (8) carloads of which were to be transported from points in North Dakota, to points in another state, and four (4) carloads of which were to be transported from Boscurvis, Saskatchewan, Canada, in through North Dakota, to points in other states; that for each of said shipments the defendant issued, signed, and delivered to the plaintiff a bill of lading; that plaintiff was and is the owner and consignor of all of such grain; that during its transportation the plaintiff did not accompany such grain or shipments, nor did he retain, or attempt to retain, or exercise any control over it whatsoever, but from the time of the shipments of such grain from the different shipping points the defendant, its agents, and servants had full and exclusive control thereof.

"3. That at Kenmare, North Dakota, between the dates hereinbefore mentioned, while such grain was being transported according to the contract between plaintiff and defendant, and while it was in the possession and under the exclusive control of the defendant, its servants, employees, and agents, it became necessary, in order to com-

plete such transportation according to contract, that such bulk wheat be transferred from boats on Des Lacs lake to cars on defendant's track at Kenmare, North Dakota; that in making such transfer the defendant, its agents, employees, and servants carelessly and negligently, through the employment and use of improperly constructed and out-of-repair machinery and devices for unloading grain, and through their negligence and lack of care in operating the same, the said defendant, its agents, servants, and employees, allowed and caused one thousand (1,000) bushels of wheat in bulk, of the value then and there of ninety-four (94) cents per bushel, or nine hundred and forty dollars ($940) in all, to be deposited and dumped in Des Lacs lake, where it became embedded in the mud and covered by the water of said lake, thereby losing and totally destroying the same and the whole thereof, to the plaintiff's damage in the sum of nine hundred and forty ($940) dollars.

"4. That no part of the said one thousand bushels (1,000) of bulk wheat delivered by plaintiff to defendant for transportation as hereinbefore alleged and dumped in said lake has ever been delivered by defendant to the consignees of said grain, nor has it or its value, or any part thereof, ever been delivered to or accounted for by defendant to the plaintiff although often demanded previous to the commencement of this action.

"Wherefore, plaintiff prays judgment against the defendant for the sum of nine hundred and forty dollars ($940) with interest thereon at the rate of 7 per cent per annum (7%) from and after the first day of November, 1910, together with his costs and disbursements of this action."

The answer admitted defendant's corporate existence, and also admitted that during the times mentioned it owned and operated a line of railway extending from the city of Minneapolis in the state of Minnesota to Portal in the state of North Dakota, but expressly denied all other allegations of the complaint.

The following facts were indisputably established by the evidence in this case: That the plaintiff, during the fall of 1910, operated certain grain elevators at Newport and Paisley, North Dakota, and Boscurvis, Saskatchewan, all being situated on the shores of Des Lacs lake. That such lake points were all situated a considerable distance away from any railway line owned or operated by the defendant. That

a corporation known as the Des Lacs Lake Navigation Company owned and operated a boat or barge line between the lake points named and Smith's (landing), the latter place being located about 3 miles from Kenmare. That the defendant railway company had constructed a sidetrack or spur from its main line at Kenmare, North Dakota, to Smith's (landing). That such spur or sidetrack was originally constructed through the solicitations of the officers of the navigation company, and under an agreement whereby the navigation company was to reimburse the defendant railway company for the expense of building said spur track by allowing the defendant to retain the navigation company's share of the freight receipts to the extent of $1,000, but that in event the business continued thereafter, the railway company would repay said $1,000 to the navigation company by paying to it 10 per cent of all moneys received by the railway company for shipments of freight received by it over said spur track.

The defendant railway company published a schedule of freight tariffs of 22 cents per hundredweight for shipments of wheat between the above-mentioned lake points and Minneapolis and Duluth respectively. By an agreement between the navigation company and the defendant railway company it was provided that the navigation company should receive 5 cents per bushel (for wheat and certain other kinds of grain) as its proportionate share of such through tariff, and the railway company the balance.

(The proper division of such joint or through rate between the defendant railway company and the navigation company was one of the questions discussed in Knapp v. Minneapolis, St. P. & S. Ste. M. R. Co. 33 N. D. 291, 156 N. W. 1019. While this question is of no particular moment in the instant case, it may be stated that the evidence in this case is all to the effect that the navigation company was to receive 5 cents per *bushel,* for wheat and certain other kinds of grains, of such through rate.)

The apparatus for transferring the grain from the navigation company's boats to the defendant's cars at Smith's (landing) was also owned by the navigation company. The entire equipment of the navigation company was owned solely by such company, and the defendant railway company owned no part thereof. The men who operated the boats

and transacted the business of the navigation company were the employees of such company alone. No part of the operation expenses of the navigation company was borne by the defendant, although there is evidence to the effect that defendant's attorney at one time advanced $50 for the purpose of repairing one of the barges; but there is also evidence to the effect that plaintiff advanced about $250 to pay wages due to certain employees of the navigation company. In short, the navigation company and the railway company were independent carriers, and there were no relations between them except the agreement relative to the construction of the spur or sidetrack, and the agreement for the division of the through tariff or freight charges.

During September and October, 1910, the plaintiff shipped certain wheat from his elevators at the three lake points above-mentioned. Such wheat was transported upon the barges of the navigation company from the different lake points to Smith's (landing), where it was transferred from the barges and loaded upon the cars of the defendant railway company, and forwarded to its destination. Neither the navigation company nor the railway company had any agents at the lake points, nor were any bills of lading issued by the navigation company for any of the shipments. But after the grain had been loaded upon the defendant's cars at Smith's, the plaintiff or some one acting for him billed such shipments and received from the defendant's agent at Kenmare bills of lading therefor. It is conceded, however, that no bill of lading was ever issued by the defendant for any shipment until after the grain actually had been loaded into the cars of the defendant railway company at Smith's (landing), and the different bills of lading issued by the defendant described by number the particular car in which such grain had been loaded.

The original bills of lading were not produced upon the trial, but plaintiff offered in evidence certain receipts or memoranda, which, it is asserted, contain all the provisions embodied in the original bills of lading. Such receipts or memoranda show shipments as follows:

September 29, 1910, two carloads from Boscurvis, Saskatchewan, to Kingston, Ontario;

October 13, 1910, two carloads from Paisley to Minneapolis;

October 20, 1910, two carloads from Boscurvis, Saskatchewan, to Kingston, Ontario;

October 22, 1910, two carloads from Newport to Duluth;

October 27, 1910, two carloads from Newport to Duluth;

October 29, 1910, two carloads from Newport to Duluth.

The face of the receipt for the first shipment reads as follows:

For use in connection with the Standard form of Straight Bill of Lading approved by the Interstate Commerce Commission by Order No. 787 of June 27, 1908.

Des Lacs Lake Navigation Co.<br>Minneapolis, St. Paul, & Sault Ste. Marie Ry.

Shippers No.........

This Memorandum is an acknowledgment that a bill of lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

Agents No.........

Received subject to the classifications and tariffs in effect on the date of the receipt by the carrier of the property described in the Original Bill of Lading.

at Boscurvis, Sask., Sept. 29, 1910, from D. C. Knapp, the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned and destined as indicated below, which the Minneapolis, St. Paul, & Sault Ste. Marie Railway Company agrees to carry to its usual place of delivery at said destination, if on its road, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions, whether printed or written, herein contained (including conditions on back hereof) and which are agreed to by the shipper and accepted for himself and his assigns.

The Rate of Freight from ...................................
to...........................is in cents per 100 lbs.

---

---

Consigned to Barnum Grain Co. ..............................
Destination Kingston, ......State of Ont. ....County of ........
Route c/o Great Northern Elev. Co. Superior, Wis. Car Initial Soo,.
　　Car No. 25,636.

| No. Packages | Description of Articles and Special Marks | Weight |
|---|---|---|
| | Wheat | 60000 |
| | Bonded | Capacity |

D. C. Knapp, Shipper.　　　.........................Agent.
　Per ...............　　　　Per ........................

Among the conditions appearing on the back, and made part of such receipt, were the following: "Section 2. In issuing this bill of lading this company agrees to transport only over its own line, and except as otherwise provided by law acts only as agent with respect to the portion of the route beyond its own line. No carrier shall be liable for loss, damage, or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier, except as such liability is or may be imposed by law, but nothing contained in this bill of lading shall be deemed to exempt the initial carrier from such liability so imposed. Section 5. . . . Property destined to or taken from a station, wharf, or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves, or landings shall be at owner's risk until the cars are attached to, and after they are detached from, trains." The receipt is a printed form used by the defendant railway company, but the words, "Des Lacs Lake Navigation Co.," appearing at the top are in writing, and were written at the same time the blanks in the body of

the instrument were filled in. The receipts for all the other shipments are in the same form, with the exception that in four of them the words, "Des Lacs Lake Navigation Co.," do not appear at the top of the receipts, but are inserted in the body of the instrument, in the blank space immediately following the word "route." Hence every receipt, and consequently, according to plaintiff's own contention, every bill of lading, on its face refers to the Des Lacs Lake Navigation Company.

Upon the trial plaintiff was permitted to testify (over objection) to an alleged conversation, or conversations, between himself and one Cole, whom plaintiff asserts was a soliciting or traveling freight agent of the defendant. Plaintiff claims that he first learned of the elevators at the three lake points through Mr. Cole; that Cole informed him that they were good points; and that Cole quoted him a rate of 22 cents per hundredweight from the lake points to Minneapolis or Duluth, grain to be shipped over the Soo line; that plaintiff agreed to go down and look the proposition over and afterwards went to Kenmare for the purpose of doing so and made a trial trip on the boat.

The record shows that the following colloquy took place between the court and plaintiff's counsel at the time this evidence was first offered:

The Court: What is the object of this examination?

Mr. Lambert: The object is to simply show that the Soo Railroad ran that line of boats over there, made the contract, got him to go over there, went up and showed him the—

The Court (interrupting counsel): The object is to show agency, isn't it?

Mr. Lambert: We figure we have the agency established, we want to show the Soo line operated that line of boats over there.

On the presentation of defendant's case, the defendant, among others, offered the testimony of one Von Neida, the secretary of the Des Lacs Lake Navigation Company, and it was clearly and indisputably shown that the defendant railway company in no manner owned or operated the boat line, and in fact had absolutely nothing to do with it, but that the boat line was owned and operated wholly by the Des Lacs Lake Navigation Company. Mr. Von Neida also

testified that he was on one of the boats with Mr. Knapp at or about the time the boat made its first trip that fall, and that at that time he had a conversation with Mr. Knapp relative to the transportation of the grain. Von Neida's testimony was in part as follows: "This was the initial trip of the boats for that year. We went up there for the purpose of looking over the depth of the water, particularly at the elevator landing, and the new unloading device that we had at the lower end of the lake. I told Mr. Knapp at that time that we had tried to operate both the elevator business and the navigation business the preceding year, and that it was too much for one concern to handle, and I told him what my relationship was with the boats, and what percentage of the through rate that the railway company got, and I told him that we got 5 cents of the through rate from these points through to Minneapolis and Duluth. I also told him that we had been short of funds the year before, that some accounts had not been paid, and that I had made arrangements to borrow $2,000 from Dr. Ringo at Minot, through Mr. Palda, and that that money had been promised and we would be in shape, some of it we had had, and expended, and that we hoped to be in shape to handle the grain, and I tried to induce him to take the proposition of handling the elevators."

Von Neida's testimony was afterwards stricken out by the court. But the plaintiff Knapp was afterwards called, and testified in rebuttal as a witness in his own behalf, in part as follows:

Q. Now this trip that Mr. Von Neida testified about your going up the lake with him, that was after you had had your first conversation with Mr. Cole, was it?

A. Yes, sir.

Q. What happened between you and Mr. Cole after that?

A. Mr. Cole came to Portal and called me over by phone, and I told him then that the proposition did not look very good to me, and he assured me that the Soo Line would take care of me. They had expended a great deal of money, and there was no question but the thing would go well, and I told him if he would guarantee it I would go ahead.

Q. Was there anything said about the Soo giving a receipt all the way through?

A. Yes.

Objections were interposed by defendant's counsel to the testimony relative to such conversations. The defendants also moved for a directed verdict at the close of plaintiff's case, and at the close of all the testimony. Both motions were denied and the cause submitted to the jury. In its instructions to the jury the trial court said: "Gentlemen of the Jury, this case resolves itself first into a question of just what the contract was between the plaintiff and defendant with reference to the hauling of this grain, whether it was a contract that defendant should take and carry this grain from these different lake ports, Boscurvis, Newport, and Paisley, and transport it to destination, or whether they simply agreed or were to take it from the place where it was unloaded from the vessels onto the cars, as to what the contract was between Mr. Knapp and the railroad.

"Now Mr. Knapp claims that the contract was, they were to take the grain and become good for it or responsible for it from the time that it left the lake ports; while on the other hand the defendant claims they had nothing to do with the grain while it was on the lake at all, and that they had nothing to do with it until they received it on board their cars near Kenmare, North Dakota, and until they actually took possession of the cars themselves while putting the cars into their train.

"Mr. Knapp, you will remember claims that Mr. Cole was the agent of the Soo line, and he claims that Mr. Cole came up to Portal to see him about this very matter, and made representations to him, and as to what the evidence is on that point you will remember.   .  .  .

"Of course if Mr. Cole was not the agent of the railroad company to make the contract with the plaintiff to carry this grain, he would have no power whatever to bind the defendant in any manner. If he did not have power or authority to make that sort of a contract, even though he might have been the company's agent for some other purpose,.

. . .

"In addition to that (general verdict) I am going to submit to you three special findings: First. What was the value of the grain

lost by plaintiff at the time and place of unloading the grain from its boats to the cars.

"Second. Was W. A. Cole the agent for the defendant company for the purpose of making a contract with the plaintiff to carry the grain from Newport, Paisley, and Boscurvis to destination.

"Third. Did W. A. Cole make a contract with the plaintiff to carry said grain from said towns to destination.

"In addition to your general verdict you will answer those three questions."

The jury returned affirmative answers to interrogatories numbered 2 and 3, and fixed the value of the wheat lost in answer to interrogatory No. 1, and also returned a general verdict for $853.50. Judgment was entered pursuant to the verdict, and the defendant has appealed from the judgment.

The principal errors assigned are based upon the rulings of the trial court in the admission of certain testimony relative to the alleged conversations between the plaintiff and Cole, and the denial of the motions for a directed verdict.

Plaintiff sought to establish defendant's liability by the following evidence: (1) The receipts for the shipments issued by defendant's agent at Kenmare. (2) Proof of certain conversations with defendant's agent Cole. And in their final analysis, the various assignments of error resolve themselves into, and require a determination of, these questions: (1) Did the receipts offered in evidence establish the fact that the defendant railway company received the wheat as a common carrier at the lake points, and hence was responsible for the proper transportation thereof· from such lake points? (2) Was plaintiff entitled to introduce evidence tending to show, and recover upon the strength of, a prior parol contract with an agent of the defendant railway company, binding it to be responsible for the safety of such wheat while it was being transported by a preceding connecting carrier? We will discuss these propositions in the order stated.

There is no contention on the part of the plaintiff that any of the grain was lost after it had been loaded upon the cars of the defendant railway company. It is conceded that the grain, for the loss of which plaintiff seeks to recover herein, was lost on account of some defect in, or improper operation of, the appliances used by the navigation

company to hoist the grain from the barges to defendant's car. Plaintiff's position is stated as follows in his brief on this appeal: "Plaintiff does not claim that the wheat actually entering the cars belonging to the defendant was lost, but he does claim that the wheat actually and irrevocably turned over to the defendant at stations along the lake was lost after the plaintiff had relinquished all control over it, and after the defendant had commenced transportation under its contract made by the general agent of the defendant orally and afterwards confirmed by the written bills of lading, exhibits 1 to 12. We contend that the mere fact that the manual labor in handling the grain along the lake was done by persons not in the direct employ of the defendant is wholly immaterial so long as it was done under a contract with the defendant."

There is no controversy as to the facts with respect to the issuance of the shipping receipts. It is conceded that in every instance such shipping receipts were issued by the station agent at Kenmare, only after the wheat had actually been loaded upon the different cars of the defendant railway company described in the various shipping bills. There is no claim made, or evidence offered to show, that the station agent at Kenmare had any authority, either actual or ostensible, except such as his employment as station agent conferred upon him. Plaintiff's contention that the shipping receipts show a contract on the part of the defendant railway company to transport the wheat from the lake points rests primarily on the fact that the shipping receipts recite that the wheat was received at Newport, Paisley and Boscurvis, respectively.

While, ordinarily, a common carrier does, or even may be required to, issue bills of lading for goods delivered to it for transportation, yet, in the absence of a statutory rule on the subject or express stipulation between the parties affecting the conclusiveness thereof, the issuance of a bill of lading does not render a carrier liable unless, or until, the property described therein is delivered to it for transportation. Conversely it may be stated that the carrier is not relieved from liability because it has not issued a bill of lading for property actually delivered to and accepted by it for transportation. In short the existence or nonexistence of primary liability on the part of the carrier does not depend upon whether a bill of lading has been issued, but

34 N. D.—31.

such liability depends upon whether there has been a complete delivery to the carrier by the owner of the goods for the purpose of transportation. 5 Am. & Eng. Enc. Law, 187; 4 R. C. L. 695; Michie, Carr. § 407; Missouri, P. R. Co. v. McFadden, 154 U. S. 155, 38 L. ed. 944, 14 Sup. Ct. Rep. 990.

The common carrier's duties and obligations with respect to the transportation of property commence with its delivery to and acceptance by him for that purpose. The point of time marking the carrier's liability is therefore that moment when the shipper surrenders the entire custody of his goods, and the carrier receives complete control of them, for the purpose of shipment. The duty and obligation respecting the care and safety of such goods rests wholly either upon the owner of the goods or upon the carrier. The law recognizes no division of such duty or obligation. Until it has become placed upon the carrier by a delivery to and acceptance by him, he cannot be held responsible, but the responsibility rests upon the owner; after the delivery to the carrier is complete he alone is responsible, and no duty or obligation rests upon the owner. 4 R. C. L. 688, 690; Hutchinson, Carr. 3d ed. § 105; 6 Cyc. 412, 414; Michie, Carr. § 400. An owner who delivers, and a carrier who accepts, property for transportation, delivers or accepts the same subject to the duties and obligations imposed by law. The only way in which such duties or obligations can be varied, limited, or extended is by special contract between the parties. 5 Am. & Eng. Enc. Law, 187; 4 R. C. L. 695; Michie, Carr. § 407. This rule is in harmony with and recognized by § 6212, Compiled Laws, 1913, which reads: "A bill of lading does not alter the rights or obligations of the carrier as defined in this chapter unless it is plainly inconsistent therewith." But, although not conclusive upon the parties, still a bill of lading issued by an authorized agent of a carrier is always competent (and generally prima facie) evidence, tending to prove that the property therein described was delivered to such carrier for shipment. Michie, Carr. § 411; 5 Am. & Eng. Enc. Law, 188.

Ruling Case Law (4 R. C. L. 695), states the rule to be as follows: "A bill of lading or other receipt is not ordinarily essential to a complete delivery, but as such an instrument is merely evidence that the carrier has received possession of the property, this fact may be shown by any other legitimate evidence. Conversely, it may be stated that

the mere signing of a receipt or bill of lading does not transfer possession of freight to a common carrier, and consequently such an instrument is not conclusive, but only prima facie, evidence of its receipt. So it is conceded, seemingly without controversy, that where a ship master or carrier's agent issues a bill of lading for goods no part of which is ever delivered to the carrier, the bill of lading is invalid in the hands of the pretended shipper to whom the carrier delivers it, and creates no liability on the part of the carrier in his favor. Also it appears that at least as between shipper and carrier, such a receipt may be contradicted as to the quantity of goods received or their condition when shipped."

The shipments involved in this action were all interstate shipments, and hence within, and controlled by, the provisions of the Acts of Congress relative to Interstate Commerce in so far as such acts are applicable. Southern P. Co. v. Crenshaw, 5 Ga. App. 75, 63 S. E. 865; State ex rel. Railroad Commission v. Adams Exp. Co. 171 Ind. 138, 19 L.R.A.(N.S.) 93, 85 N. E. 337, 966. And the question as to the proper construction of the bills of lading for such interstate shipments is a Federal one, and subject to review as such by the Federal Supreme Court. Georgia, F. & A. R. Co. v. Blish Mill. Co. 241 U. S. 190, 60 L. ed. 948, 36 Sup. Ct. Rep. 541. There is no contention, however, that the Acts of Congress define a bill of lading, prescribe its form, or give to it any additional or unusual contractual or evidentiary effect.

As comprehending all methods of transportation, a bill of lading has been defined by the courts and text-writers as a written acknowledgment of the receipt of goods, and an agreement to transport and to deliver them at a specified place to a person named or on his order. 4 R. C. L. 3; Bouvier's Law Dict.; Whitnack v. Chicago, B. & Q. R. Co. 82 Neb. 464, 19 L.R.A.(N.S.) 1011, 30 Am. St. Rep. 692, 118 N. W. 67; Davis v. Central Vermont R. Co. 66 Vt. 290, 44 Am. St. Rep. 852, 29 Atl. 313. And under the laws of this state "a bill of lading is an instrument in writing signed by a carrier or his agent, describing the freight so as to identify it, stating the name of the consignor, the terms of the contract for carriage and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place." Comp. Laws 1913, § 6209.

The Interstate Commerce Act as amended (June 29, 1906) pro-

vides "that any common carrier, railroad or transportation company *receiving* property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass. . . ." (34 Stat. at L. 595, chap. 3591, Comp. Stat. 1913, § 8592, Fed. Stat. Anno. Supp. 1909, pp. 273, 274.)

And Section 10028, Compiled Laws of North Dakota, provides: "Every person being the master, owner or agent of any vessel, or officer or agent of any railroad, express or transportation company or otherwise being or representing any carrier, who delivers any bill of lading, receipt or other voucher, or by which it appears that any merchandise of any description has been shipped on board any vessel or delivered to any railroad, express or transportation company or other carrier, *unless the same has been so shipped or delivered, and is at the time actually under the control of such carrier, or the master, owner or agent of such vessel, or of some officer or agent of such company,* to be forwarded as expressed in such bill of lading, receipt or voucher, is punishable by imprisonment in the penitentiary not less than one and not exceeding five years, or by a fine not exceeding $1,000, or both."

The above quoted statutory provisions, both state and Federal, clearly contemplate that bills of lading shall be issued only for goods which have actually been received by, and are in the possession of, the carrier at the time the bill of lading is issued.

A bill of lading is said to be an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property delivered to a carrier for transportation. In the latter, it is a contract to carry safely and deliver. See Pollard v. Vinton, 105 U. S. 7, 26 L. ed. 998; Missouri P. R. Co. v. McFadden, 154 U. S. 155, 38 L. ed. 944, 14 Sup. Ct. Rep. 990; Elliott, Railroads, § 1415; Michie, Carr. §§ 473–476.

And "in its twofold character of receipt and contract the bill of lading is subject to different rules of construction. In so far as it is merely a receipt either party may explain or contradict it by parol,

but as a contract it must be construed according to its terms." See Elliott, Railroads, § 1415.

Cyc. (6 Cyc. 421) says: "A bill of lading is an instrument twofold in its character; it is a receipt as to the quantity and description of the goods shipped, and a contract to transport and deliver the goods to the consignee or other person therein designated, and upon the terms specified in the same instrument. It states the terms of the shipment, anl also specifies the quantity of goods received, and sometimes their condition. While it may not, as already stated, be varied by parol evidence so far as it embodies the terms of the contract, yet, so far as it constitutes a receipt, it is like other receipts or written acknowledgments, subject to be contradicted or explained by proof as to the facts. Thus a bill of lading is evidence of the receipt of the goods by the carrier, but may be contradicted by evidence that no goods were received. Authorities agree without dissent to the proposition that recitals in the bill of lading as to the quantity of goods received by the carrier may be contradicted as between the parties by parol evidence showing a less quantity to have been delivered."

Ruling Case Law (4 R. C. L. 17, 18), states the rule to be as follows: "So far as a bill of lading is a receipt, it has the same character as other receipts, and is subject to the same principles of law. There is no more solemnity in its execution nor any more importance to be attached to it than to other instruments of a like nature. It may be stated generally that the receipt clauses in a bill of lading are subject to explanation, variation, or contradiction by parol evidence, as the general rule applicable to the admissibility of parol evidence to vary a written contract is not applicable to such clauses. The fact that both a contract and a receipt are embodied in the same instrument forms no reason why they should be regarded as differing in effect from similar instruments executed in an independent form. The clauses in a bill of lading which relate to the quantity and condition of the goods received do not enter into the contract between the parties and are explainable by parol." See also Michie, Carr. §§ 473–476.

As has been noted above, the authorities are agreed that, ordinarily, at least as between the original parties, the recitals in the shipping receipt relative to the kind, quantity, and condition of the goods received for shipment are construed as a receipt, and, hence, subject to the rules

of evidence applicable to receipts. Obviously the recitals relative to the time and place the goods were delivered to the carrier for transportation are equally a part of the receipt clause in the instrument, and subject to the rules of construction applicable to receipts.

While common carriers are required to carry all goods offered to them in the usual course of business, yet under the rule announced by the great weight of authority in this country a carrier is not "bound by law to accept and carry goods beyond the terminus of its own line. In the absence of any agreement, either express or clearly implied, for transportation beyond its own line, the common-law duty of an independent carrier is performed by safely transporting the goods over its own line and delivering them to the consignee or connecting carrier, as the case may be. If, in such a case, the goods are merely to be delivered by the initial carrier to a connecting carrier for further transportation, the former is considered as a forwarding agent rather than a carrier as to such further transportation, and is not liable for the default of subsequent carriers." Elliott, Railroads, 2d ed. § 1432. See also 6 Cyc. 374; 4 R. C. L. 875. The above-quoted rule is in harmony with, and practically covered by, § 6259, Comp. Laws 1913, which provides: "If a common carrier accepts freight for a place beyond his usual route, he must, unless he stipulates otherwise, deliver it at the end of his route in that direction to some other competent carrier, carrying to the place of address, or connected with those who thus carry *and his liability ceases upon making such delivery."*

Of course, all state laws are *pro tanto* superseded, and interstate shipments controlled, by the Carmack amendment to the Interstate Commerce Act, whereby a carrier receiving property for interstate transportation is made liable for loss or injury to such property anywhere en route, with a remedy over against the carrier at fault. The Carmack amendment, however, in no manner attempts to make a subsequent or terminal carrier liable for the acts of a preceding carrier. See Michie, Carr. § 3653. The Carmack amendment has no application to, and places no additional liability upon, the defendant in this case.

In determining whether a contract made for the carrier by an agent is binding, the principles of agency are applicable, and if the contract is within the general scope of authority of the agent, the

carrier will be bound thereby.  6 Cyc. 431.  And conversely a carrier will not be bound by a contract outside of the general scope of authority of such agent, unless it is shown that the agent had express authority to make such contract.  6 Cyc. 432.  An agent has such authority as the principal actually or ostensibly confers upon him.  Comp. Laws 1913, § 6336.  Actual authority is such as a principal intentionally confers upon the agent or intentionally or. by want of ordinary care allows the agent to believe himself to possess.  Comp. Laws 1913, § 6337.  Ostensible authority is such as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess.  Comp. Laws 1913, § 6338.

There is no contention that the station agent at Kenmare had any authority, either actual or ostensible, greater than that conferred upon him by virtue of his general employment as station agent.  The question, therefore, is presented, whether he, as such station agent, had authority to bind his principal, the defendant railway company, by contract either to carry goods from the lake points, or to be responsible for their safety, while they were carried upon the boats of the Des Lacs Lake Navigation Company.

In construing a statute identical with § 6259, supra, the South Dakota supreme court held that a station agent, as such, had no authority to contract for shipments over connecting lines, nor could his authority to do so be inferred from the fact that he collected freight for the entire distance.  Sutton v. Chicago & N. W. R. Co. 14 S. D. 111, 84 N. W. 396; Coates v. Chicago, M. & St. P. R. Co. 8 S. D. 173, 65 N. W. 1067.

This is also recognized as the correct rule by the various textwriters. "We will see hereafter that the weight of authority in this country is that the carrier receiving goods for transportation to a destination beyond his own line impliedly contracts as carrier only for his own line, and in jurisdictions where this is the rule it is evident that an agent attempting to contract for transportation over a connecting line is exceeding his ordinary authority as agent of the receiving carrier, and his principal is not bound by such contract in the absence of express authority."  6 Cyc. 432.

"A local station agent's authority extends only to the control of the carrier's business at his own station.  Such agent has no implied au-

thority to make any contract which will bind the company with reference to freight to be received at a different station than his own; when he attempts to do so, his act, until ratified, will not bind the company. This is in harmony with the well-settled rule that a principal is not bound by a contract made by an agent that is not within the actual or apparent scope of the agent's authority. The existence of express authority to make such contract is susceptible of proof." Michie, Carr. § 625.

"Prima facie the person in charge of a station at one place (station agent) has no power to act for the railway company in reference to the making of a contract of shipment to his station from another station on the railroad. Nor would it be the duty of the station agent receiving notice relating to a shipping contract made elsewhere, to transmit such notice to agent at the station at which the shipment was made. His failing to do so would involve the road in no liability." Michie, Carr. § 626.   See also McManus v. Chicago G. W. R. Co. 138 Iowa, 150, 128 Am. St. Rep. 180, 115 N. W. 919; McLagan v. Chicago & N. W. R. Co. 116 Iowa, 183, 89 N. W. 233; Pollard v. Vinton, 105 U. S. 7, 26 L. ed. 998; Ætna Nat. Bank v. Water Power Co. 58 Mo. App. 532.

In order to hold defendant liable under the bills of lading, we must hold that the station agent at Kenmare, by virtue of his general authority as such, had authority to bind his principal, the defendant railway company, to carry goods from points distant from such station and distant from defendant's line of railway; and had authority to assume a liability then existing for goods which had been lost through the negligence of a preceding carrier before the bills of lading were issued. We are agreed that these acts were not within the general scope of his authority as such station agent.

The next question presented is whether the court erred in permitting plaintiff to introduce evidence tending to show a prior parol contract with the defendant's freight agent, Cole.

We have hereinabove set out plaintiff's complaint in full. It will be noted that it alleges that the defendant, railway company, owned and operated the boat line. If this had been the fact, then, of course, the questions presented for our determination on this appeal would not have arisen. But, as already stated, the evidence disclosed that the

boat line was owned and operated, not by the defendant, but by the Des Lacs Lake Navigation Company, an independent, connecting carrier. The complaint makes no reference to any special contract. In fact the only references in the complaint to any agreement to transport the wheat are the following clauses: "That for each of said shipments the defendant issued, signed, and delivered to the plaintiff a bill of lading;" and "that at Kenmare, North Dakota, between the dates hereinbefore mentioned, while such grain was being transported according to the contract between plaintiff and defendant, . . . it became necessary, in order to complete such transportation according to contract."

The bills of lading are not set out in the complaint, nor is there anything said to indicate that the statutory or common-law rights or obligations of the parties were in any manner altered by any conditions or stipulations in the bills of lading. Hence it must be presumed that they were not altered, as the rights or obligations of a carrier are not altered by a bill of lading unless the stipulations in the bill of lading are plainly inconsistent with the rights and obligations created by operation of law. Comp. Laws 1913, § 6212.

The complaint charged the defendant with a breach of duty. The injury for which plaintiff seeks to recover is alleged to have been occasioned by the fact that "in making such transfer (transferring the wheat from the boats to the cars) the defendant, its agents, employees, and servants carelessly and negligently through the employment and use of improperly constructed and out of repair machinery and devices for unloading grain and through their negligence and lack of care in operating the same, . . . caused 1,000 bushels of wheat to be deposited and dumped in Des Lacs lake." "Plaintiff's complaint stated a cause of action ex delicto, and charged a violation of the common law duties of a carrier." Cooke v. Northern P. R. Co. 22 N. D. 266, 270, 133 N. W. 303.

No legal duty, statutory or otherwise, rested upon the defendant to carry plaintiff's grain from the lake points or to assume responsibility for its safety while it was being transported upon the barges of the Des Lacs Lake Navigation Company. An obligation to do so under the undisputed facts in this case could not possibly exist by virtue of any legal duty which the defendant owed to the public in general, but if it existed

at all, it existed by virtue of a special contract between the plaintiff and the defendant. As already stated, the complaint does not allege any such contract to exist, but charges defendant with violation of its duties as a carrier while transporting goods upon its own lines.

It may be considered a settled point, on principle and authority, that the nature of the cause of action is determined by the allegations of the complaint, so that the inquiry need never extend beyond this first pleading in this suit. Pom. Code Rem. § 559.

The complaint is intended to form the foundation of the proof to be submitted by the plaintiff upon the trial, and should advise the defendant what the plaintiff relies upon as a cause of action. 31 Cyc. 43.

Pomeroy (Pom. Code Rem. § 554) says: "The very object and design of all pleading by the plaintiff, . . . is that the adverse party may be informed of the real cause of action . . . relied upon by the pleader, and may thus have an opportunity of meeting and defeating it if possible at the trial. Unless the petition or complaint . . . fully and fairly accomplishes this purpose, the pleading would be a useless ceremony, productive only of delay, and the parties might better be permitted to state their demands orally before the court at the time of the trial. The requirement, therefore, that the cause of action . . . must be stated as it actually is, and that the proofs must establish it as stated, is involved in the very theory of pleading. It frequently happens, however, and from the very nature of the case it must happen, that the facts as proved do not exactly agree with those alleged. To determine the effect of such a disagreement we must recur to the reason and object of the rule, and they furnish a certain and equitable test. If the difference is so slight that the adverse party has not been misled, but, in preparing to meet and contest the case as alleged, he is fully prepared to meet and oppose the one to be actually proved, then no effect whatever is produced by the variance; to impose any loss or penalty on the pleader would be arbitrary and technical. In the second place, the difference, while it does not extend to the entire cause of action . . . may be so great in respect to some of its particular material facts as to have misled the adverse party, so that his preparation in connection with that particular is not adapted to the proofs which are produced. In such circumstances an amendment is proper because the variance is partial, but it is obviously equitable that terms should be imposed.

Finally, if the divergence is total, that is, if it extends to such an important fact, or group of facts, that the cause of action  . . .  as proved would be another than that set up in the pleadings, there is plainly no room for amendment, and a dismissal of the complaint  . . .  is the only equitable result.  It should be noticed that, in order to constitute this total failure of proof, it is not necessary for the discrepancy to include and affect each one of the averments.  A cause of action as stated on the pleadings might consist, say, of five distinct issuable or material facts; on the trial four of these might be proved as laid, while one so entirely different might be substituted in place of the fifth that the cause of action would be wholly changed in its essential nature."

In Cooke v. Northern P. R. Co. 22 N. D. 266, 133 N. W. 303, this court held that where a plaintiff elects to bring an action based upon the violation of the common-law duties of a carrier, he cannot be permitted to recover where it is shown that the relation between the parties are governed by a special contract.  See also Normile v. Oregon R. & Nav. Co. 41 Or. 177, 69 Pac. 928; Bedell v. Richmond & D. R. Co. 94 Ga. 22, 20 S. E. 262; Gulf, C. & S. F. R. Co. v. Darby, 28 Tex. Civ. App. 229, 67 S. W. 129.

The principle enunciated in Cooke v. Northern P. R. Co. supra, is directly applicable here.  In the case at bar defendant was advised by the complaint that plaintiff sought to recover damages for the loss of grain, lost while the same was in the custody and under the control of the defendant upon boats owned and operated by the defendant; but upon the trial he was permitted to introduce evidence tending to show, and recover upon the theory, that defendant, by reason of a special contract, was responsible for the safety of such shipments, not only over its own lines, but also over the lines of an independent connecting carrier over whose line the shipments were first transported.  We are agreed that this evidence was variant from, and inadmissible under, the complaint.

Whether plaintiff has shown a right to recover damages for breach of a special contract is a question upon which we express no opinion as it is not involved, nor is it a proper issue, herein.  It follows from what we have said above that the judgment below must be reversed, and the action dismissed.

Respondent also submitted a motion for dismissal of the appeal.  The

notice of such motion, served upon appellant's counsel, recited that plaintiff, at a stated time and place, would move "for a dismissal of the above-entitled action  .  .  .  for lack of prosecution in that no brief has been served or filed by the appellant in said action. . If the above-entitled appeal is being prosecuted in good faith, and the appellant's brief is filed with the court and served on the undersigned on or before the 20th day of May, 1915, this motion will not be pushed for argument or insisted upon, as the purpose of the undersigned is to get the case disposed of, etc."

There was no personal appearance either on behalf of, or in opposition to, said motion at the time the same was noticed to be heard, but the same was considered on the motion papers theretofore filed by respondent, and as appellant's brief had not been filed, the motion to dismiss was granted. On the following·day appellant's counsel moved that the order of dismissal be vacated, and filed certain affidavits in support thereof. The order of dismissal was vacated, and the case set for argument on a day certain. Before argument on the merits, the respondent again moved for a dismissal of the appeal, and submitted certain affidavits in opposition to the affidavits filed by appellant. Respondent's counsel assailed the order reinstating the appeal on the ground that the·same had been entered without notice. We have carefully considered the affidavits of the respective parties and the merits of the respective motions, and while appellant failed to file his brief within the time provided by the rules of this court, still we are wholly agreed that the showing made by appellant's counsel is sufficient to justify a vacation of the order of dismissal and a denial of the second motion to dismiss. We believe, however, that respondent is entitled to terms. We have therefore decided that in lieu of such terms no costs shall be taxed against plaintiff in this action.

Judgment reversed, and the cause remanded for further proceedings consistent with this opinion.

BRUCE, J. (dissenting). I am unable to concur with the above opinion. Counsel for appellant contends that "plaintiff has, by his own offer in evidence, established the contract under which the plaintiff and defendant dealt in respect to the transportation of the grain, and has thereby rendered incompetent and immaterial the negotiations by

him with the soliciting freight agent, Cole, because these negotiations were all prior to the making of these bills of lading." He also contends that the bills of lading exempt the defendant railway company from liability for the grain until actually loaded into its cars.

Counsel, however, is somewhat inconsistent in his positions. He insists that the terms of the bills of lading control, and that the testimony in regard to all prior negotiations to explain the same is incompetent and irrelevant, yet, at the same time, his whole defense is based upon an attempt to vary those very terms. The bills of lading specifically receipt for the grain, not at Kenmare, the point of the beginning of the rails of the railway company, but at the elevator points of Boscurvis, Paisley, and Newport. The contracts for shipment, indeed, which are contained in all of the bills of lading, and the only promises therein contained, are made by the defendant railway company, and by the defendant railway company alone. They are signed by the agent of the railway company, no attempt whatever being made to show that this person was agent for any one else but the railway company. The bills of lading upon their face show conclusively a contract between the railway company and the plaintiff, Knapp, and between these parties alone, and show conclusively an agreement on the part of that railway company to carry the goods from the elevator points to the points of destination. Defendant, however, seeks to show that these receipts which receipted for the grain, not at Kenmare, but at Boscurvis, Newport, and Paisley, and that its contracts to convey the grain, not from Kenmare, but from the said elevator points, were merely given as a matter of accommodation, and although his case is tried on this very theory, and this theory alone, he objects to the admission of the testimony of the witness Knapp, which tends to show the prior negotiations and to show that the receipts, in fact, evidenced the real contract, which was for the transportation of the goods from the elevator points, and not from Kenmare.

Either one proposition or the other must be true, and it is clear that the bills of lading alone control, or else that there is an ambiguity in them which can be explained by parol evidence, and in either event the record and the evidence are in my opinion such that the matter was properly submitted to the jury, and their verdict is controlling. Even if we take the position that the bills of lading are controlling and must

be considered alone, there can be no doubt of a contract for transportation by the railway company from the elevator points, and that, under such contract, the railway company is liable for the loss of the grain anywhere between such elevator points and the points of destination. There can be no question, indeed, that the railway company was the initial carrier. "The initial carrier," the court said, in the case of Savannah, F. & W. R. Co. v. Commercial Guano Co. 103 Ga. 590, 30 S. E. 555, "is not necessarily the one that first receives the goods from the shipper but it is the one that first receives the goods with an undertaking to transport and safely deliver them to the consignee at the place of destination." See also Noyes v. Rutland & B. R. Co. 27 Vt. 110; Swift v. Pacific Mail S. S. Co. 106 N. Y. 206, 12 N. E. 583; Evansville & C. R. Co. v. Androscoggin Mills, 22 Wall. 594, 22 L. ed. 724; note to 31 L.R.A.(N.S.) page 2.

That the second of two connecting carriers may become the initial carrier by contract, and agree to be liable for the transportation from the point of origin of the freight, though not upon its own line, cannot now be controverted. We have discussed this question in the prior case of Knapp v. Minneapolis, St. P. & S. Ste. M. R. Co. 33 N. D. 291, 156 N. W. 1019, and all that is necessary here is to refer to that case and to the cases of Savannah, F. & W. R. Co. v. Commercial Guano Co. supra; Noyes v. Rutland & B. R. Co. 27 Vt. 110; Swift v. Pacific Mail S. S. Co. 106 N. Y. 206, 12 N. E. 583; Evansville & C. R. Co. v. Androscoggin Mills, 22 Wall. 594, 22 L. ed. 724, and to the so-called Carmack amendment. See also Ogdensburg & L. C. R. Co. v. Pratt, 22 Wall. 123, 22 L. ed. 827.

The bills of lading, as I have before stated, expressly receipted for the goods at the elevator points. The promises in the bills of lading were made by the railway company, and by the railway company alone; they were made by its agent, and by its agent alone, and it is well established that when a bill of lading receipts for goods as having been received at a certain point and agrees to carry such goods to another point, such bill of lading contains not merely a receipt for the goods, but a promise to carry or convey the goods between the points mentioned. I am well aware of the numerous authorities which hold that the receipt part of a bill of lading may be overcome by parol evidence, and that it may be shown that the goods were never received at all or

were not of the quantity receipted for. I have yet to find a single authority, however, which looks upon this promise to convey as a part of the receipt, and provided that the goods were received at the points named in the receipt, the authorities are overwhelming that the contract is conclusive.

If, then, the bills of lading control, the only question is the construction of the clauses thereof which provide that: "Section 2. In issuing this bill of lading this company agrees to transport only over its own line, and except as otherwise provided by law acts only as agent with respect to the portion of the route beyond its own line. No carrier shall be liable for loss, damage, or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier, except as such liability is or may be imposed by law, but nothing contained in this bill of lading shall be deemed to exempt the initial carrier from any such liability so imposed. Section 3. No carrier is bound to transport said property by any particular train or vessel or in time for any particular market or otherwise than with reasonable despatch, unless by specific agreement indorsed hereon. Every carrier shall have the right in case of physical necessity to forward said property by any railroad or route between the point of shipment and the point of destination; but if such diversion shall be from a rail to a water route the liability of the carrier shall be the same as though the entire carriage were by rail. Section 5 . . . Property destined to or taken from a station, wharf, or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves, or landings shall be at owner's risk until the cars are attached to and after they are detached from trains."

I do not see how these provisions are applicable in the case before us. The receipt was given for the wheat, not at Kenmare, but at the elevator points. Under that receipt the carrier became the *initial carrier*. It is not sought to be held liable for the loss of goods *beyond* the points of destination or upon the line of a subsequent carrier, but upon a line on which it had itself agreed to be liable. It had charged a rate of 22 cents, which was the rate not from Kenmare, but from the elevator points. It had receipted and taken the grain and the grain was loaded

at the elevator points. The loss mentioned occurred while the grain was being unloaded at the wharf at Kenmare, and it had been loaded "into the cars or vessels" of the defendants at the elevator points and from that point the railway company assumed responsibility for it. Section 5 of the provisions of the bills of lading merely applies where grain is taken in the first instance from a private wharf or landing or from the wharf or landing of a connecting carrier over whose line the said carrier has not assumed any responsibility. It cannot apply where the defendant is the initial carrier and where the loss occurs after the goods have been received by it as such initial carrier. See St. Louis Southwestern R. Co. v. Kilberry, 83 Ark. 87, 102 S. W. 894.

If on the other hand the bills of lading were ambiguous (and the defendant itself seeks to vary the terms thereof by showing that the receipts for the goods at the elevator points were merely made as a matter of accommodation), then parol evidence was admissible to explain the real contract between the parties. Not only this but § 6213 of the Compiled Laws of 1913 provides that "a carrier must subscribe and deliver to the consignor . . . any reasonable number of bills of lading of the same tenor, expressing truly the *original contract for carriage.*" If the parol evidence was admissible and competent, and I think it was, then there can be no question as to the liability of the defendant, or at any rate there was evidence to go to the jury showing such liability.

According to the testimony of the plaintiff (and this the jury was justified in taking at its full weight), the agent Cole held himself out as a general agent of the railway company, and there is certainly evidence outside of his own statements that his actions as such were ratified by the company. The plaintiff, Knapp, testified explicitly that he had been induced to lease the elevators by the promises of Cole that the defendant railway company would care for him and would get his grain out, and that Cole said that "the bills of lading will read from Boscurvis, Paisley, and Newport, and that I (Knapp) will get my receipts at Kenmare." There is evidence that there were no agents of either the navigation company or the railway company at the elevator points, and that this custom had been followed. The bills of lading therefore in the case at bar were issued in conformity to this agreement. In other words both by the bills of lading and by the prior parol agree-

ment, the railway company undertook to carry the wheat from the elevator points to the Minnesota terminals, and the receipts or bills of lading were given at Kenmare rather than at the elevator points merely because there were no agents at those elevator points.

The rate published (the 22-cent rate from the elevator points and the 17-cent rate from Kenmare) was published by the railway company and the railway company alone. The name of the navigation company did not appear therein or thereon except in one part where the tariff sheet states that the rate given will include "the cost of elevation at Smith's landing." The bills of lading were given by the railway company, and not by the navigation company, and although in some of them and at the top of the name of the railway company was written that of the navigation company, the promise to carry was the promise of the railway company alone, and read "Received subject to the classification and tariffs in effect on the date of the receipt by the carriers of the property described in the original bill of lading *at Boscurvis, Sask.* (Newport or Paisley, as the case might be) from D. C. Knapp the property described . . . which the Minneapolis, St. Paul and Sault Ste. Marie Railway Company agrees to carry to its usual place of delivery at said destination."

The defendant and appellant in short claims that the bills of lading control, and the plaintiff is absolutely bound thereby. He seeks, however, to vary their terms and to show that the promise to carry from the elevator points did not mean what it said, and yet objects to oral proof of what the promise was. That proof shows that the bills of lading were in conformity to the oral agreement, and which was to carry from the elevator points, and not from Kenmare.

It may be that a station agent has no implied authority to contract a liability beyond the line of the railway. The bills of lading, however, in the case at bar were issued under authority of the general agent and in the course of business which had been ratified by the company.