The **BALTIMORE AND OHIO RAIL-
ROAD COMPANY**, Boston and Maine
Railroad, et al., Plaintiffs,

v.

**UNITED STATES** of America

and

Interstate Commerce Commission,
Defendants.

Civ. No. 13530.

United States District Court
D. Maryland.

June 5, 1963.

C. C. Rettberg, Jr., Baltimore, Md., J. Edgar McDonald, New York City, Chester A. Prior, Boston, Mass., for plaintiffs.

Joseph D. Tydings, U. S. Atty., Robert W. Kernan, Asst. U. S. Atty., Baltimore, Md., William H. Orrick, Jr., Donald B. MacGuineas, Robert W. Ginnane, Arthur J. Cerra, Dept. of Justice, Washington, D. C., and Frederick B. Abramson, Dept. of Justice, for defendants.

WINTER, District Judge.

This is an action, under 5 U.S.C.A. § 1009, 28 U.S.C.A. § 1336, and 49 U.S.C.A § 17(9), to suspend, enjoin, set aside, and annul an order of the Interstate Commerce Commission determining that certain rates charged to the United States for the carriage of military vehicles by the plaintiff, The Baltimore and Ohio Railroad Company (hereafter called "B. & O."), during the period March 13, 1947 to May 12, 1952, and certain rates charged to the United States for the carriage of military vehicles by the plaintiff Boston and Maine Railroad (hereafter called "Boston and Maine"), during the period March 13, 1947 to April 27, 1948, were unjust and unreasonable. The report and order of the Commission were entered March 25, 1960, by Division 3, 310 I.C.C. 63 (1960).

The case arose in the following manner: During the periods in question, the two plaintiffs transported numerous carload shipments of military motor vehicles and trailers over their lines and connecting lines, and charged and collected rates on the basis of the minimum weight provisions of the tariffs applicable to the flat cars furnished. The charges were paid by the United States without prior audit, as authorized by 49 U.S.C.A. § 66 (1951 Ed.), [subsequently amended, 49 U.S.C.A. § 66 (1962 Supp.)]. When the General Accounting Office audited the paid bills, it questioned the justness and reasonableness of the rates charged, on the theory that the plaintiffs had charged on the basis of the minimum weight for the size of the car used for any shipment, rather than the rate applicable to the size of car ordered, where that size was capable of carrying the load to be transported.

As a consequence, the United States, acting under the authority of 49 U.S.C.A. § 66, supra, deducted from subsequent bills for other services amounts representing the differences between the charges theretofore paid and the charges contended to be proper. Plaintiffs then sued in the Court of Claims to recover the deductions which had been made, and, by its order dated February 6, 1957, as amended May 7, 1958, the Court of Claims referred to the Interstate Commerce Commission for its determination the question of whether the transportation charges originally assessed and collected by the plaintiffs were unjust and unreasonable and, if so, to what extent. On March 7, 1957, the United States instituted a proceeding before the Interstate Commerce Commission which resulted in the final order sought to be reviewed here. The parties agree that the order is one "for the payment of money" and, hence, the action to suspend, enjoin, annul or set aside, in whole or in part, the Commission's final order may be heard and determined by a single judge, without the necessity of a three-judge court, 28 U.S.C.A. §§ 2321 et seq., Pennsylvania R. Co. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960). General jurisdiction is vested in the Court by 28 U.S.C.A. § 1336. Although the action is instituted in the name of the B. & O. and Boston and

Maine, both in the proceedings before the Interstate Commerce Commission and in this Court, 313 of the other Class-I railroads in the United States have been permitted to intervene in support of the position of the plaintiffs here.

The controversy as to the justness and reasonableness of the rates is grounded upon Rule 66(a) of Tariff Circular No. 20, 49 C.F.R. § 141.66, and the effect of its absence from the tariffs employed by the plaintiffs to assess the collected charges. Rule 66(a) was first adopted on June 11, 1928, and has continued in effect, except for the period January 30, 1942 to October 1, 1945, when, because of the impracticality of its application during the war years, it was suspended by Service Order No. 68 of the Interstate Commerce Commission. Insofar as pertinent, Rule 66(a) provides:

"(1) Carriers provide cars of varying dimensions and capacities, and they provide minimum weights for the several kinds of cars based upon those dimensions and capacities. At times when transportation facilities are inadequate to supply the demand upon them it frequently is difficult or impossible for the carrier to furnish a shipper with a car of the dimensions or capacity desired by him, although the carrier has in its tariffs provisions for the use of such car. Manifestly it is not equitable or proper to require the would-be shipper to pay additional transportation charges for the privilege of using a car of different dimensions or capacity from that which would suit his shipment or forego entirely his desire to ship.

\* \* \* \* \* \*

"(3) The Commission believes that when tariffs provide minimum weights which vary with the size of [sic] capacity of the car, it is the duty of the carrier to incorporate in such tariffs a rule to the effect that when a car of the dimensions or capacity ordered by the shipper cannot be promptly furnished, and when the carrier for its own con-

venience does provide a car of greater dimensions or capacity than that ordered, such car may be used on the basis of the minimum carload fixed in the tariffs for cars of the dimensions or capacity ordered by the shipper, provided the shipment could have been loaded into or upon the car of the capacity or size ordered;

\* \* \* \* \* \*

"(4) In all such cases the capacity of the car ordered, the date of such order, the number, initials, and capacity of the car furnished should be stated on the bill of lading and the carrier's waybill.

"(5) In case of controversy between shippers and carriers caused by the absence of such rule from tariffs which provide graduated minima for cars of different sizes the Commission will regard such tariffs as *prima facie* unreasonable.

"(6) It is the duty of carriers to provide reasonable facilities for transportation, and if they cannot furnish equipment to move the carloads provided for in their regulations it is clearly their duty to provide some other method of transporting as one shipment, and at the rate named therefor, such carload weight when tendered by shipper."

After hearing all of the witnesses, and considering all of the evidence, the I.C.C. trial examiner found that for the pertinent periods the charges of the B. & O. involved 275 shipments from 33 origins throughout the United States to 25 destinations on the lines of the B. & O.; and those of the Boston and Maine involved 26 shipments from Culbertson, Pennsylvania to Concord, New Hampshire, 1 shipment from Culbertson to Ayer, Massachusetts, and 1 shipment from Detroit, Michigan to Ayer. Notwithstanding the presumption of unreasonableness purportedly created by Rule 66(a), the trial examiner recommended a finding that a shortage of flat cars occurred in 1946 and continued through 1952, except for the recession year of

1949 and the first portion of 1950 prior to the Korean incident, that it was rare for representatives of the United States, as shipper, to order a railroad car of a given size for a particular shipment, that, in fact, the plaintiffs were reasonably successful in meeting the needs of the military and avoiding inefficient handling of equipment and that, therefore, the presumption of unreasonableness created by Rule 66(a) had been rebutted, so that the Commission should find that the charges assailed were not unreasonable, and the Court of Claims advised of this determination.

When exceptions were filed to the report of the trial examiner, they were sustained by Division 3 of the full Commission, one commissioner dissenting. Division 3 found that typical origins of the shipments were the Army Ordnance Depots at Culbertson, Pennsylvania, Springfield, Illinois, Pueblo, Colorado, and Defense, Texas, that some of the military vehicles to be shipped had a wheel base of 231 inches, and the remainder a wheel base of 257 inches, and that every shipment moved on a flat car selected from a pool which representatives of the United States maintained at each depot. The Commission further indicated that, normally, the Army ordered its car requirements by telephone, but that there was a conflict of testimony as to whether each car was ordered by size. It also found that on each of the government bills of lading the Army transportation officer, or one of his clerks, was required to insert both the length of the car ordered and the length of the car actually provided by the carrier, and that each bill of lading for which the government sought to sustain its right to a deduction indicated by notation that the car used was longer than the car ordered. Because of the conflict of testimony with respect to whether cars were ordered by size, Division 3 placed primary reliance upon the actual bills of lading, which were signed by the plaintiffs' agents without protest, as the best evidence on the disputed question. Division 3 also found that the evidence failed to establish that there was a flat car shortage at Pueblo, Springfield and Defense sufficient acute to warrant disregard of Rule 66(a). As an ultimate fact, Division 3 found that plaintiffs did not overcome the presumption of unreasonableness created by Rule 66(a); hence, it was concluded that the charges assessed, i. e., minimum car load weight of the car used, were unjust and unreasonable to the extent that they exceeded those which would have accrued, based on the respective minimum weights for the cars ordered, as shown on the bills of lading. An order discontinuing the proceedings was entered and petitions for reopening and reconsideration were denied.

■ Plaintiffs assail the validity of the Commission's final order on three grounds. The first is that there were not adequate findings by the Commission to constitute compliance with the statutory duty placed upon an administrative agency by § 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b), second that the Commission's findings are not supported by substantial evidence, and third that the Commission either disregarded or failed to give proper consideration to evidence showing that Rule 66(a) was inapplicable, or that, notwithstanding that rule, the rates charged and collected were shown to be just and reasonable. Because of the Court's view of the case, it is necessary to consider only the plaintiffs' second contention. Insofar as the second contention is concerned, the controversy is one of the limited questions of fact as to whether there was substantial evidence on the basis of the whole record to support the findings and conclusions of the Commission, § 10(e) (B) (5) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e) (B) (5); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308 (1912). Absent such evidence, the findings and conclusions upon which they rest cannot stand.

 While Rule 66(a) creates a presumption of unreasonableness, the presumption does not come into play unless and until the facts upon which its application is predicated are established by substantial evidence, see Illinois Cent. R. Co. v. Interstate Commerce Comm., 206 U.S. 441, 459–460, 27 S.Ct. 700, 51 L.Ed. 1128 (1907). The facts which must be established before the rule becomes operable are: (1) that the shipper *ordered* a car of a particular size, National Paint and Manganese Co. v. Southern Ry. Co., 291 I.C.C. 32 (1953); see also Noble v. B. & O. R. R. Co., 22 I.C.C. 432 (1912); (2) that the carrier was given sufficient time to furnish the car ordered, Noble v. B. & O. R. R. Co., supra; Rule 66(a) (3); and (3) that the shipment would have fitted on the car allegedly ordered, Rule 66(a) (3). That the burden of proof rests on the person seeking the advantage of the presumption—the shipper—seems only reasonable. The government does not contend otherwise, but asserts that it met the burden by substantial evidence.

To establish that flat cars were ordered by size the government offered proof which may be grouped in three categories: first, proof of Army regulations requiring Army personnel to order cars by size, second, bills of lading, containing notations as to size of car allegedly ordered, and third, testimony from Mr. Frank K. Morrison with regard to ordering procedure followed at the Letterkenny Depot, Culbertson, Pennsylvania, only. The plaintiffs, in opposition, offered testimony that, generally, no written orders were placed, that even telephone orders were by number and not size (unless an unusually large or small car was desired), that at each depot a pool of cars was maintained by the Army under its control and supervision, and that it was the Army which selected from that pool the needed cars for shipment.

Division 3, after reciting in greater detail than is set forth above the evidence of the government and the plaintiffs, characterized it as a "conflict of testimony as to whether the Army actually ordered every car by size" and, in view of the conflict, concluded "we must accept these bills [bills of lading] as the best evidence on this question."

 Factually, there was no proof that the government ordered cars of *a specified size* prior to the date of shipment. Although the Army regulations required an order by size and although these regulations were said to have been usually followed, no witness familiar with the depots at Springfield, Illinois, Pueblo, Colorado, and Defense, Texas, was offered to show that these regulations were observed at those depots. The Railroads' representatives, at these depots, who had acted generally in supervisory capacities and thus had limited personal knowledge of the mechanics of the ordering process, although they had some knowledge, testified that neither written orders nor verbal orders specifying size of car were received by the Railroad. To characterize this as a "conflict of evidence" goes beyond charity. Evidence of custom to prove ordering must not only show that a custom was in existence, but *some* evidence must be produced to show that the custom was followed in a particular location. Here there is a total lack of such evidence and no "conflict" can arise as to depots at Springfield, Pueblo and Defense.

As to the depot at Culbertson, Mr. Frank K. Morrison, the former manager of the Traffic Department at that depot, from which Boston and Maine shipments originated, confidently testified that flat cars were always ordered by size. However, after being confronted with an "anticipatory" order specifying number but not size of cars, and as his testimony continued, particularly in regard to the actual mechanics of the ordering process, it became obvious that he was testifying as to a conclusion. He admitted that on the Thursday of each week during the period in question, he gave an "anticipatory" order specifying the number but not size of the required cars for the following week, but he went on to say that he usually followed this up later by a telephone call specifying size. This lat-

ter statement does not, however, withstand close scrutiny. Why, if a follow-up order specifying size was to be given, an anticipatory order specifying number would be of any value escapes this Court, for, if the anticipatory order was to be acted upon by the Railroad, it would be to procure that number of cars, yet if a later order specifying size was to be given, the prior procurement would be totally ineffective and uneconomical. Indeed, no attempt is made to explain this "dual" procedure by the witness or the government. Mr. A. W. Thoms, who was supervising agent for plaintiff, Boston and Maine, at Culbertson, and who had personal knowledge of the period in question, testified that the "anticipatory" order was considered the government's order, that any follow-up order by telephone was usually an *additional* order specifying number but not size unless particularly small cars were desired.

In testifying as to the actual mechanics of the car-furnishing process, Mr. Morrison stated that the flat cars ordered would be moved into the government depot, where a pool of cars were maintained; that it was government personnel who actually controlled the pool, that as particular cars were needed, the military would either select one from the pool or else cars which had arrived laden but were thereafter unloaded and were more convenient for loading, and that notification of such selection was given to the Railroad and acquiescence received from it.

Mr. Morrison also testified that the Stock Control Division made up the shipments on shipping tickets specifying number and size of cars and that these were sent to the Traffic Department, which he supervised, where they were checked to determine that the shipments will fit on the specified cars. It was at this point that his testimony became a maze, for some of his testimony would indicate that at this point in time, the orders to the Railroad were placed, yet, he also testified that when he received the shipping tickets from the Stock Control Division, *the shipments were ready to move.* Additionally, Mr. Morrison testified that the ordering process was between him and the Army yardmaster at the pool, with the permission of plaintiff, Boston and Maine, although he considered the subsequent notification to the carrier of removal the ordering process, rather than securing the carrier's acquiescence, for such removal. This latter characterization was based on Mr. Morrison's belief that ultimate control of the pool was vested in the carrier, although, in fact, there was no evidence of the carrier's refusal of such permission, or a withholding of acquiescence. Other evidence introduced by plaintiffs showed that the government was in complete control of the pool and that notification of a removal of a car from the pool was solely for informational purposes only, i. e., the serial number of car removed, and the number of cars that remained. Mr. Morrison's testimony was a conflict in itself. One version supported the plaintiffs' position that there was no ordering by size from plaintiffs, and any reference to size was confined strictly between military personnel. The other version supports the government. However, the latter represents the conclusion of the witness; the former is based on testimony concerning the actual facts and mechanics of the ordering process. Plainly, such inconsistent and confusing evidence cannot form a sufficient basis to support one side of the asserted "conflict in testimony," where the military, not the carrier, selected the car from a pool, which was maintained by weekly orders, and the cars ordered were used, not when furnished, but at a later date, after they had been moved into the pool controlled by the military.

The finding by Division 3 that cars were ordered by size to be sustained at all must be supported by the evidence with regard to the bills of lading. A closer analysis of this evidence indicates that the information as to the size of car ordered, shown on the bills of lading, originated from shipping tickets, used *interdepartmentally,* by the Army, show-

ing the size of car on which a particular shipment would fit. There is no evidence to indicate that this data was put on the bill of lading at the time that the cars were ordered, *or that the data was obtained from any documents or papers used in ordering the cars from the carrier*. Moreover, in almost every case the bills of lading were prepared subsequent to the dates of shipments.

Factually and legally, the notations on the bills of lading do not constitute substantial evidence to support the finding of Division 3 that the shipper in this case ordered cars by size. The bills of lading contained no notation of the person from whom a car of a particular size was ordered and, as has been previously shown, there is no other evidence to establish that fact. Since the actual selection of a particular car to be used was made by the military, the notation that a car of a particular size was ordered may just as well be read to mean ordered from the Army yardmaster as to mean ordered from the carrier's representative. In fact, the carrier witnesses testified that bills of lading bearing the notation on which the government relied, were signed because of a variety of reasons: (1) they believed that the notation was mere surplusage in that the government was paying the minimum weight charge for the car used as the tariff provided, and that the notation as to size of car ordered was meaningless and had even been carried on bills of lading during the period of wartime suspension of Rule 66(a); (2) the agent paid no attention to this aspect of the bill of lading but, rather, checked the correctness of the serial number of the car used, the goods shipped, and the route of the shipment; and (3) the notation was considered only a military interdepartmental record of orders from the Army yardmaster.

While the government argues strenuously that the bills of lading are contracts between the government and the plaintiffs and/or *prima facie* establish, or at least constitute an admission, that cars of the size ordered as shown thereon were in fact ordered, citing Crenshaw v. Charleston & W. C. Ry. Co., 196 I.C.C. 646 (1933) and South Carolina Produce Ass'n. v. Aberdeen & R. R. Co., 205 I.C.C. 581 (1934), both were cases where recitations on bills of lading as to the goods shipped were treated as significant evidence, but in both, unlike the case at bar, additional and corroborative evidence to establish the correctness of the notation was offered.

These cases do not support the government's position here. They are merely examples of the long established rule that certain recitations in a bill of lading are contractual, while others are *prima facie* evidence of the facts they purport to record. Recitations as to the quantity and quality of the goods shipped are generally held to be *prima facie* evidence of those facts, Strohmeyer & Arpe Co. v. American Line S. S. Corp., 97 F.2d 360 (2 Cir. 1938); whereas, the contractual aspects are those relating to the agreement to carry goods via a certain route on a designated car, 9 Wigmore on Evidence (3rd ed. 1940), §§ 2415(4), 2537; Knapp v. Minneapolis, St. Paul & S. S. M. Ry. Co., 34 N.D. 466, 159 N.W. 81 (1916). The notations as to size ordered on the bills of lading on which the government relies fit neither the contractual nor the *prima facie* proof aspects of the bill of lading. Of course, by statute, 15 U.S.C.A. § 1281 and 18 U.S.C.A. § 659, a bill of lading may be *prima facie* evidence of other facts which it recites, but no statute has been found that has that effect as to any notation of size of car ordered. Nor do Wheeler, Lumber, Bridge & Supply Co. v. S. P. Co., 16 I.C.C. 547 (1909) and Continental Steel Corp. v. Pennsylvania R. Co., 232 I.C.C. 329 (Div. 3, 1939), supply this *prima facie* probative value by decisional law. They indicate that the notation as to size ordered must appear on the bill of lading as a condition precedent to bringing suit and that without such a notation proof of specific ordering will not be considered. Indeed, these authorities would indicate that the absence of notation as to the date that certain

size cars were allegedly ordered, in compliance with Rule 66(a) (4), may well constitute a fatal defect in the government's proof.

On the other hand, Noble v. B. & O. R. R. Co., supra; National Paint & Manganese Co. v. Southern Ry. Co., 291 I.C.C. 32 (1953); and Bullock v. Chicago, B. & Q. R. Co., 19 F.Supp. 862 (D.C.Minn. 1937), indicate that in situations similar to the instant one, notations as to sizes of cars ordered or charges paid, absent other evidence to prove their correctness, clearly will not support a finding of such facts.

█ In accordance with general law, the Court concludes that the notations relied on by the government were neither a record of an actual order to the carrier nor an admission of that fact by the carrier's representatives and cannot be a substantial basis, either alone, or in conjunction with the other evidence produced, to support a finding of ordering by size *from the carriers here*.

From the evidence that has been recited, it also appears that there is equally lacking a substantial evidentiary basis for the second basic finding, upon which the application of Rule 66(a) is predicated, i. e., the finding that cars of the size allegedly ordered could not be "promptly" furnished, and that the originating carrier "for its own convenience" provided a car of greater size than that allegedly ordered. As to promptness, the evidence as to the time at which the cars were ordered, the fact that they were ordered by number, and that sometime later, if at all, they were designated as to size, makes a finding that the plaintiffs had a reasonable opportunity to furnish a car of a stated size an unsupportable conclusion. Similarly, the undisputed evidence that the military selected the cars actually to be used from the pool previously ordered and any empties which may have accumulated in the railroad yard, from which Division 3 found that the government selected the cars actually used, renders impossible a finding that the carrier "for its own convenience" provided a car of greater

size than that allegedly ordered. The government seeks to avoid this latter conclusion by characterizing the testimony of Mr. Morrison that he did not refuse cars of the size furnished "because the shipment was ready to move" as meaning that Mr. Morrison was "forced" to accept cars larger than those which he ordered. Where the fact that cars of a given size were desired was either not communicated to the plaintiffs, or was communicated at such a late date that the plaintiffs could not reasonably comply, any coercion on the part of Mr. Morrison was that of the government, since it was the one who, in the first instance, had the responsibility of ordering by size. Equitably the government cannot turn this default to its own advantage.

In regard to the third basic finding upon which application of Rule 66(a) is predicated, i. e., that each shipment could have been loaded into or upon a car of the size allegedly ordered, again, the finding of Division 3 is unsupported by substantial evidence. No testimony of any person qualified to testify as to what size vehicle would fit into any given size flat car was presented. The only evidence available for the Commission's consideration was a series of mathematical computations, based upon data recorded in the bills of lading from which the government sought to sustain its set-off only in those instances where the combined length of the vehicle carried did not exceed the length of the flat car allegedly ordered.

Computations of this nature, when considered alone, are quite suspect. It is quite obvious that vehicles having a given combined length cannot be loaded on a flat car of lesser length. But, short of this obvious fact, it can hardly be assumed that the vehicles carried would be loaded bumper to bumper, yet what is a proper tolerance between them was left unexplained. That this absence is significant appears from the fact that the government's final proof (certain claims of set-off were abandoned at the hearing because, mathematically, the combined length of the vehicles carried exceeded

the length of the railroad car allegedly ordered) concerned approximately 253 shipments. Of these, as to approximately 75 shipments, the length of the car used exceeded the length of the car ordered by only 3½ feet, or less, and as to approximately 104 shipments by 6 feet, or less. Expert opinion as to proper loading space was of the utmost importance where the military evinced a strong belief that anything that fits mathematically, fits realistically.

■■ Since there was a lack of substantial factual basis upon which the Commission could find the three basic facts, or any one of them, rendering Rule 66(a) applicable, the conclusion of Division 3 that Rule 66(a) rendered the charges in question here unjust and unreasonable, and that the plaintiffs had failed to overcome this presumption, is erroneous and cannot stand. For that reason, the order of the Commission will be suspended, enjoined, set aside and annulled, and the case remanded to the Commission for further proceedings not inconsistent with this opinion. Counsel may agree upon a formal order.