The **BALTIMORE AND OHIO RAIL-ROAD COMPANY** et al.

v.

**UNITED STATES of America and Interstate Commerce Commission.**

**Civ. A. No. 74–3054.**

United States District Court,
E. D. Pennsylvania.

April 1, 1975.

John J. Ehlinger, Jr., Philadelphia, Pa., J. T. Clark, Cleveland, Ohio, C. R. Hrdlicka, Detroit, Mich., for plaintiffs.

John H. D. Wigger, Dept. of Justice, Washington, D. C., for defendant U.S.A.

Richard H. Streeter, Interstate Commerce Commission, Washington, D. C., for defendant I.C.C.

Henry T. Reath, Philadelphia, Pa., Howard Gould, Cincinnati, Ohio, for intervening defendants.

Before ADAMS, Circuit Judge, and LUONGO and WEINER, District Judges.

## OPINION

LUONGO, District Judge.

This is an action before a three-judge district court pursuant to 28 U.S.C. §§ 1336(a), 1398, 2284, 2321–2325 and 49 U.S.C. § 17(9) to suspend, enjoin, set aside and annul certain orders of the Interstate Commerce Commission.

## (a) *Background*

These proceedings had their genesis in 1967 when railroads in certain sections of the country filed tariff provisions covering rates and charges for intra-plant, intraterminal and interterminal switching service. Certain rates and charges were established for such switching service if the shipments were made on ordinary equipment, but if made on non-ordinary ("special") equipment, there was added to the rates and charges a surcharge of $25 per car (since raised by ex parte increases to $49.52 per car). For the purposes of this suit, ordinary equipment refers to gondola cars having a marked weight capacity of 180,000 pounds or less, while gondolas with a marked weight capacity greater than 180,000 pounds are referred to as "special" equipment.[1] The purpose of the surcharge was to prevent the use of expensive and specialized equipment in switching movements.[2]

The tariffs were permitted to become effective notwithstanding the opposition of several parties, including the Institute of Scrap Iron & Steel, Inc. (Institute), one of the intervening defendants here. Followng the adoption of the tariffs, the number of gondolas with a marked capacity in excess of 180,000 pounds increased, thereby increasing the likelihood of surcharge. In 1970, the Institute and some of its member scrap dealers[3] filed a complaint[4] with the Commission alleging that the surcharges were in violation of §§ 1(4), 1(5), 1(6), 1(11), 2 and 3(1) of the Interstate Commerce Act, 49 U.S.C. § 1 et seq., and in violation of the Commission's rules governing tariffs and charges as published in Tariff Circular No. 20, rule 66(a), 49 C.F.R. 1300.66(a). Complainants sought a cease and desist order, cancellation of the "special" car tariff provision, and reparations.

The gravamen of the complaint was that complainants ordered ordinary gondolas which were quite adequate for their needs for the shipment of scrap within switching districts, but carriers sometimes furnished "special" gondolas; that carriers did so for their own convenience since the additional weight capacity of the "special" gondolas was of no use to complainants, consequently the carriers should have charged only for the cars ordered, as required by rule 66(a). The complainants charged further that the practice placed shippers receiving "special" gondolas at a disadvantage with their competitors and resulted in unequal treatment among shippers equally situated, in violation of the various sections of the Act prohibiting unduly discriminatory and prejudicial treatment.

The Commission followed its modified procedures, in which the parties submit verified statements. On the record thus made, the Commission's Administrative Law Judge issued his report and recommended order (August 6, 1971), concluding that the carriers' differentiation between ordinary and "special" gondolas in the switching charges had not been shown to be unjust, unreasonable or otherwise unlawful, and concluding further that rule 66(a) was inapplicable The Administrative Law Judge's report was adopted and affirmed by Review Board No. 4 (September 18, 1972).

Upon petition for reconsideration, Division 2 of the Commission, acting as an appellate division, reopened the proceedings, re-evaluated the evidence in the record, and concluded that the switching charges were in violation of the Act. Division 2 refused to award reparations

---

1. Also designated as "special" equipment were gondola cars equipped with covers, hoods, containers or cradle floors. Such specially equipped gondolas are not in issue in this suit.

2. There is no surcharge for the use of such equipment in line haul service.

3. Arrow Steel & Supply Co., Central Metal Co., Chicago Metals Corp., The David J. Joseph Co., Hyman-Michaels Co., Laro Coal & Iron Co., Luria Bros. & Co., Inc., and United Iron & Metal Co., Inc.

4. Institute of Scrap Iron & Steel, Inc. v. Aberdeen and Rockfish R.R., Docket No. 35330, 346 I.C.C. 296.

because of the sketchiness of the record, but it held that rule 66(a) [5] was applicable; and that there was a violation of § 1(6),[6] and that the tariff differential to shippers ordering the same equipment was potentially unjustly discriminatory and unduly prejudicial under §§ 2 [7] and 3(1).[8] Division 2 issued orders (May 8, 1974) requiring the railroads "to abstain from violations of sections 1(6), 2, and 3(1) of the Interstate Commerce Act herein found to exist" and to publish and thereafter maintain "a carrier convenience rule pursuant to rule 66(a) of Tariff Circular No. 20 on intraplant, intraterminal, and interterminal switching of 'nonordinary' gondola cars in interstate commerce carrying ferrous scrap." [9]

On November 11, 1974, Division 2 denied carriers' petition to reopen and reconsider, and reinstated its May 8, 1974 order, modifying it to require compliance within thirty days from that date.

The railroads listed in the caption then instituted the present action against the United States and the Interstate Commerce Commission, claiming the Commission erred in its ruling and seeking preliminary and final injunctive relief. Other railroads have intervened as plaintiffs.[10] The Institute and the mem-

---

5. Relevant portions of rule 66(a) are set forth infra, p. 254.

6. "§ 1, *par. (6). Classification of property for transportation; regulations and practices.* It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful."

7. "§ 2. *Special rates and rebates prohibited* If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

8. "§ 3, *par. (1). Undue preferences or prejudices prohibited.* It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

9. Generally, the carrier convenience rule requires the carrier to charge the rate for the equipment ordered if the carrier, for its convenience, furnishes more expensive equipment. See discussion in part (c) infra.

10. The Atchison, Topeka and Santa Fe Ry., Green Bay and Western R.R., The Kansas City Southern Ry., Missouri Pacific R.R., St. Louis Southwestern Ry., SOO Line R.R., Southern Pacific Transportation Company, Union Pacific R.R., Louisville and Nashville R.R., Seaboard Coast Line R.R., Southern Ry., Illinois Central Gulf R.R., and St. Louis-San Francisco Ry.

bers who participated in the Commission process intervened as defendants.

In the instant proceedings, plaintiff carriers seek to set aside the Commission order contending that the Commission erred both as a matter of law, and because there was insufficient evidence to support application of rule 66(a) and findings of violations of §§ 1(6), 2 and 3(1).

Following the filing of this suit, the Commission stayed the compliance date of its order until March 17, 1975, and later extended the compliance date until April 17, 1975, making it unnecessary for this court to consider whether to issue preliminary injunctive relief. By agreement of the parties, the matter was presented to this court on final hearing on March 11, 1975.

### (b) *Scope of Review*

Judicial review of orders of the Interstate Commerce Commission is limited. 5 U.S.C. § 706(2) sets forth the pertinent standard:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(E) unsupported by substantial evidence . . .

\* \* \* \* \* \*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

Each of the subsections of § 706(2) provides a separate standard for review.

Bowman Transportation, Inc. v. Ark.-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

Under § 706(2)(E) the role of the court is to determine whether the agency's findings are supported by substantial evidence. Ill. Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 87 S. Ct. 255, 17 L.Ed.2d 162 (1966); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence has consistently been defined as "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U. S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). The possibility that two inconsistent conclusions can be drawn from the evidence does not prevent a finding that the agency decision was supported by substantial evidence. Consolo v. F. M. C., 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); N. L. R. B. v. Nevada Consolidated Copper Co., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). It is the job of the Commission to make findings of fact and a district court may not substitute its own conclusions for those fairly drawn by the Commission from the evidence. Ill. Central R.R. v. Norfolk & Western Ry., *supra,* 385 U.S. at 69, 87 S.Ct. 255.

If substantial evidence supports the Commission's findings, these findings may not be set aside unless "arbitrary and capricious". § 706(2)(A). Under this standard a reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U. S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In *Bowman Transportation, supra,* 419 U.S. at 285, 95 S.Ct. at 442, the Supreme Court applied this standard while reviewing an I.C.C. order and noted: "While we may not supply a reasoned basis for the agency's action that the agency itself has not given,

SEC v. Chenery Corp., 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995], we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206]."

### (c) *Applicability of rule 66(a).*

Throughout these proceedings, plaintiff carriers' major contentions have centered upon the asserted non-applicability of Tariff Circular No. 20, rule 66, which provides in pertinent part:

"(a) *Weights for cars of varying dimensions.*

(1) Carriers provide cars of varying dimensions and capacities, and they provide minimum weights for the several kinds of cars based upon those dimensions and capacities. At times when transportation facilities are inadequate to supply the demand upon them it frequently is difficult or impossible for the carrier to furnish a shipper with a car of the dimensions or capacity desired by him, although the carrier has in its tariffs provisions for the use of such car. Manifestly it is not equitable or proper to require the would-be shipper to pay additional transportation charges for the privilege of using a car of different dimensions or capacity from that which would suit his shipment or forego entirely his desire to ship

. . . .

\* \* \* \* \* \*

(3) The Commission believes that when tariffs provide minimum weights which vary with the size of capacity of the car, it is the duty of the carrier to incorporate in such tariffs a rule to the effect that when a car of the dimensions or capacity ordered by the shipper cannot be promptly furnished, and when the carrier for its own convenience does provide a car of greater dimensions or capacity than that ordered, such car may be used on the basis of the minimum carload fixed in the tariffs for cars of the dimensions or capacity or-

dered by the shipper, provided the shipment could have been loaded into or upon car of the capacity or size ordered . . . . .

\* \* \* \* \* \*

(5) In case of controversy between shippers and carriers caused by the absence of such rule from tariffs which provide graduated minima for cars of different sizes the Commission will regard such tariffs as prima facie unreasonable."

Rule 66(a) was designed to protect shippers from paying for larger and more expensive cars than they need or want. Rule 66(a)(3), the carrier convenience rule, provides that where shippers order cars of dimensions and capacities adequate for their needs, and carriers, for their own convenience, furnish cars larger than requested, the carriers are required to "protect" the shippers by charging them the rate for the cars ordered rather than the rate for the larger cars furnished.

The record discloses that scrap metal and steel are shipped by gondola cars because the configuration of the gondola makes it highly suitable for such shipments. The quantity of scrap shipped in a gondola is dependent upon the cubic capacity of the car, not its weight carrying capacity. In gondolas of the usual dimensions, scrap shipments average only about 100,000 pounds, far less than the rated capacity (over 180,000 pounds) of the "special" gondolas.

The "special" gondolas here involved have generally the same dimensions as the ordinary gondolas, differing only in the size and the weight bearing capacity of the heavy-duty trucks. For that reason, scrap shippers order only ordinary cars from the carriers. Although the over 180,000 pound "special" cars comprise less than 7% of the gondola car fleet suited for carrying scrap, and notwithstanding that the surcharge was designed to discourage the use of these scarce and expensive cars in switching movements, nevertheless carriers sometimes tender them to shippers ordering ordinary cars. Because gondolas are in

extremely short supply, and because of time commitments in scrap contracts and the concern that ordinary gondolas will not be timely furnished, scrap shippers cannot, as a practical matter, refuse the "special" cars when tendered. Mills served by scrap dealers often receive scrap *only* by rail, making such traffic a "captive" of the rail carriers. If two competing scrap shippers order ordinary cars, one could receive a "special" car, in which case he would have the choice either to forego shipment or to use the car and pay the surcharge, with the resultant competitive disadvantage.

 The foregoing facts are undisputed in these proceedings. The carriers dispute that these facts furnish support for the Commission's finding that "at a minimum, . . . the convenience of *both* parties, carrier *and* shipper, is served by the carrier tendering the larger car in the absence of the ability to promptly furnish a car of the size ordered. Such a finding of convenience of both parties requires that the carriers protect the lower rate on the standard car ordered in accordance with rule 66(a). United States v. Atlantic Coast Line R. Co., 318 I.C.C. 869, 871–872 (1963)." 346 I.C.C. at 301 (Emphasis in original). In our view there is substantial evidence in the record supporting this finding.

Harris Rothenberg, Vice President of Arrow Steel & Supply Company, in his verified submission to the Commission, stated:

"In many instances, the carriers voluntarily tender the larger cars contrary to our request and, the gondola car shortage being what it is, Arrow Steel has no alternative but to accept the car and load it. If we were to refuse the larger car there is no way of knowing when and if a substitute car will be offered. If the replacement is substantially delayed our sale is jeopardized. This question of erratic car supply is extremely critical in the ferrous scrap industry because scrap sale contracts expire in a set period of time, usually 30 days, and if the material is not loaded and consigned in that time period, the sale is lost."

Mr. Rothenberg related three specific occasions when his company used a proferred "special" car because there was no assurance that the ordinary car would be timely furnished by the carrier:

1. B&O 366126. Delivered load on September 4, 1970 and was unloaded by Arrow. When the carrier informed Arrow on September 8, 1970 that no ordinary gondolas were available, this "special" gondola was used for shipment.

2. N&W 98124. Three ordinary cars were requested on September 2, 1970. Only this "special" car was offered, and the car was used and the surcharge was paid.

3. B&O 367184. Four cars were requested on August 29, 1970. Only the "special" car listed was offered and the car was used and the surcharge was paid.

The verified statement submitted to the Commission by Joseph Schnall, General Traffic Manager of Luria Bros. & Co., Inc., another scrap processor, while lacking details of specific car movements, recited essentially the same complaint detailed in the Rothenberg statement. Although Luria always ordered ordinary cars, "special" cars were often supplied by the carriers and Luria was compelled to use these cars because of the gondola car shortage and the need to meet contract commitments. Its alternative was to forego shipment and lose the sale.

The record supports the Commission's finding that, at the least, the "special" gondolas were supplied for the convenience of both carriers and shippers. Since the carriers tendered "special" cars when ordinary cars were ordered, they did so presumably because it was more convenient for them to do so. But the record reveals that it also suited the scrap shippers' convenience to use the first available gondolas to prevent a

back-up of scrap at the plants of their sources of supply.

Carriers contend that, to support the conclusion that rule 66(a) was violated by the furnishing of "special" cars, the Commission must find that the "special" cars were furnished *solely* for the convenience of the carrier and, in order to do that, it must first find that (1) the shipper ordered a car of a certain size; (2) the shipper waited a reasonable time for the carrier to tender the car ordered; and (3) the shipment would have fit into the car ordered. Baltimore and Ohio R. R. v. United States, 217 F.Supp. 918, 922 (D.Md.1963).

■ *Baltimore and Ohio* sets forth a proper standard for the award of reparations. The Commission acknowledged that, in the instant case, the record was too sketchy to support a finding that the shippers waited a reasonable time for the carriers to tender the cars ordered. In the absence of specific evidence that the shippers had waited a reasonable time, the Commission was unable to find that the "special" cars were tendered *solely* for the carriers' convenience, and for that reason refused to award reparations. It did, however, conclude on adequate evidence that the practice existed and ordered prospective application of the carrier convenience rule "because the situation presented has great inherent possibilities for discrimination and prejudice between various shippers . . . ." 346 I.C.C. at 300.

■ Carriers argue also that the Commission erred as a matter of law in applying rule 66(a) to the instant proceedings. It is their contention that the very language of the rule limits its applicability to those situations in which carriers provide by their tariffs specified minima for cars of varying sizes, dimensions and capacities.[11] It is car-

riers' position that there are two indispensible elements for the application of the rule: (1) cars of varying dimensions or capacities; and (2) varying minimum weights based upon the dimensions and capacities of the cars. They contend that if either element is missing, the rule cannot apply.

Carriers point out that in the instant case there is no variation in specified minima; there is either no minimum weight at all provided for the cars, or the same minimum weight is applicable for all of the cars used, whether ordinary or "special". There is no different minimum weight for the "special" cars, there is only the flat charge which has no relationship whatsoever to the weight of the shipment.

Carriers' bid for this narrow interpretation of rule 66(a) elicited this response from the Commission: ". . . we think that the policies of the rule are equally applicable in instances whether a large number of graded minima exist, or whether, as here, there are two categories of 'minima', *e. g.*, over 180,000 pounds or under 180,000 pounds, to which two different levels of charges attach." 346 I.C.C. at 301.

In the Commission's view, when a shipper loads scrap into an ordinary car, the charge for the shipment is at the given rate per 100 pounds, but when he loads the same amount of scrap into a "special" car, the charge for the shipment is at the given rate per 100 pounds *plus* the surcharge. The Commission concluded, therefore, in a concededly broader interpretation of the rule than that advanced by plaintiffs, that the surcharge created two categories of "minima", or perhaps more accurately two categories of charges, one applicable to a car with a capacity of over 180,000 pounds, and the other to a car with a capacity of under 180,000 pounds.

11. Under such tariffs, the carriers quote a charge for carrying the freight at so many cents per 100 pounds, subject to a minimum shipment weight for the particular car. If the shipment weighs less than the specified minimum, the shipper must nevertheless pay for the minimum. If the shipment weighs heavier than the specified minimum, the shipper must pay at the rate per 100 pounds multiplied by the actual weight. The specified minima increase as the size of the cars increases.

The policy of rule 66(a) is that it is inequitable to require shippers to pay additional charges for cars of different dimensions or capacity from those which would suit their needs. Based on the evidence before it, the Commission deemed it inequitable to require scrap shippers to pay for cars not ordered and not needed for the privilege of shipping scrap metal and steel.

The policy of rule 66(a) has been applied in other cases not based on minimum weights. In Pumice Aggregate Sales Corp. v. Atchison, T. & S. F. Ry., 277 I.C.C. 351 (1950), it was applied to prevent the higher charges when shippers requested open-top cars for the loading of pumice aggregate, but received closed-top cars for which there was a higher rate per ton and, in addition, the use of such cars subjected the shipper to additional handling costs. In Citrus Fruits, Arizona and California to Eastern States, 341 I.C.C. 622 (1972), the rule was applied to prohibit payment of a higher flat charge for a larger refrigerated car when a smaller one was ordered. In these cases, the varying rates were not based on minimum weights, yet the policy of rule 66(a) was applied to prevent a charge by the carriers higher than for the cars ordered.

Courts have always shown great deference for the construction placed upon an administrative rule by the agency charged with its promulgation and administration. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). As the Supreme Court stated in Bowles v. Seminole Rock & Sand Co.,

325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945):

"The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions. But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."

The Commission's interpretation of rule 66(a) as applying to a surcharge for "special" cars based on weight bearing capacity under the circumstances existing in scrap metal industry is not "plainly erroneous or inconsistent with the regulation" and is consistent with prior Commission applications of the rule and the policy underlying it.

### (d) *Violation of Section 1(6)*

Plaintiffs' remaining contentions do not require extended discussion. The carriers argue that rule 66(a) cannot serve as a basis for a violation of § 1(6) of the Act. Section 1(6) (printed in full supra, page 4, footnote 6) requires carriers to "establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates or tariffs . . . ." Citing All States Freight v. New York, N. H. & H. R. R., 379 U.S. 343, 85 S.Ct. 419, 13 L.Ed.2d 324 (1964), plaintiffs contend that § 1(6) applies only where "class" rates[12] are in issue. The Court

12. The Supreme Court in *All States* explained the difference between "class" and "all commodity" rates: "Class rates were at the foundation of the railroad rate structure at the time of the enactment of the Interstate Commerce Act in 1887. Such rates are applied to traffic through two separate tariffs. One tariff, the 'classification,' assigns each of the many thousand commodities carried by rail to one of presently some 30 categories or classes, based upon the commodity's particular characteristics. A companion tariff specifies the rate at which each class of freight will be carried. By contrast, commodity rates, which were also in existence at the time of the original passage of the Interstate Commerce Act, are rates made specifically applicable for the carriage of a particular commodity or group of commodities from one designated point to another. The original function of commodity rates, which are generally lower than class rates, was to encourage the movement of bulk commodities, such as coal and grain." 379 U.S. at 344–5, 85 S.Ct. at 420.

in *All States* was called upon to determine whether § 1(6) applied to "all commodity" freight rates and the Court ruled that it did not, and limited its applicability to "class" rates. Section 1(6), however, also requires the carriers to "establish, observe, and enforce" just and reasonable "practices affecting . . . rates" and expressly condemns unjust and unreasonable "practices." *All States* in no way precludes applicability of § 1(6) to "practices" and the legislative history of that section removes all doubt.

In 1910, Congress amended the Interstate Commerce Act and added what now has been codified as §§ 1(6) and 15(1). Section 15(1)[13] permits the Commission, after determination that a "practice . . . is or will be unjust or unreasonable", to "prescribe . . . what individual or joint classification, regulation, or practice is or will be just, fair and reasonable, to be thereafter followed . . . ." The legislative history demonstrates that §§ 1(6) and 15(1) are to be read together and were expressly designed to permit the Commission to prohibit all unreasonable "practices."

The House Report commented upon the additions to the Act as follows: ". . . the commission is given jurisdiction to enter orders not only in regard to rates, but also in regard to classifications, regulations, or practices, whether they affect rates or not, and to determine what are proper classifications, regulations, and practices, in addition to rates, and to require the carriers not only to follow the rate which may be fixed by the order of the commission, but also to adopt the classification and conform to and establish, observe, and enforce the regulation or practice prescribed by the commission, and this provision should be read in connection with the amendment recommended by your committee to sections 1 and 13 of the existing interstate-commerce act." H. Rept. No. 923, 61st Cong., 2nd Sess. 10–11 (1910).

The Senate Minority report expressed the same view stating: "The first paragraph of the section [15] provides the authority of the commission in prescribing rates, charges, regulations, and *practices for the future* . . . ." (Emphasis added). S.Rept. No. 335, Part 2, 61st Cong. 2d Sess. 8 (1910).

The legislative history demonstrates that § 1(6) authorizes the Commission to prohibit unreasonable practices and to prescribe reasonable ones for the future. In the instant case, the Commission has precisely followed this path. The "practice" of assessing a surcharge for the

---

13. § 15. *Determination of rates, routes, etc.; routing of traffic; disclosures, etc.*

(1) Whenever, after full hearing, upon a complaint made as provided in section 13 of this title, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property, as defined in section 1 of this title, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation of practice so prescribed.

use of a "special" gondola, in the absence of a carrier convenience rule, was found unreasonable and the Commission ordered that the practice be terminated and that the carriers institute a reasonable "practice", i. e., promulgate a carrier convenience rule.

In our view the Commission did not err in ruling that an unreasonable "practice" is a proper basis for a finding of violation of § 1(6) and it acted within its authority in ordering the carriers to adopt a reasonable "practice."

(e) *Violation of Sections 2 and 3(1).*

■ Finally, plaintiffs contend that there was insufficient evidence to support findings of violations of §§ 2 and 3(1) of the Act. Section 2 declares it to be "unjust" for any carrier "directly or indirectly, by any special rate, rebate, drawback, or other device . . ." to charge one person more for "like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions." As the Supreme Court stated in Barringer & Co. v. United States, 319 U.S. 1, 6, 63 S.Ct. 967, 970, 87 L.Ed. 1171 (1943): "Section 2 is aimed at the prevention of favoritism among shippers."

■ Section 3(1) "broadly prohibits any common carrier by rail from giving 'any undue or unreasonable preference' to any person, locality or type of traffic." American Trucking v. A., T. & S. F. Ry., 387 U.S. 397, 411, 87 S.Ct. 1608, 1616, 18 L.Ed.2d 847 (1967). To support a finding of a § 3(1) violation it must be shown that (1) there is a disparity in rates, (2) that the complaining party is injured, actually or potentially, and (3) that the carriers are the common source of the allegedly prejudicial and preferential treatment. If the complainant can show these three factors, it becomes the burden of the carriers to show that the disparity was justified by transportation conditions. Chicago & Eastern Illinois R. R. v. United States, 384 F.Supp. 298, 300–301 (N.D.Ill.1974),

petition for cert. filed, 43 L.W. 3466 (Feb. 25, 1975); Big River Industries, Inc. v. Aberdeen & Rockfish R. R., 329 I.C.C. 539 (1967).

The Commission adverted to the very same facts and circumstances upon which it had relied to find violations of rule 66(a) and § 1(6) and held that the "circumstances herein described show a presumptive situation of unjust discrimination and undue preference . . . ." (346 I.C.C. at 303), shifting the burden to the carriers to justify the *possibility* of disparity of treatment of similarly situated shippers. It was the potential for discriminatory treatment inherent in the practice which the Commission found to be violative of §§ 2 and 3(1). Plaintiffs charge that the Commission's reliance upon Citrus Fruits, Arizona and California to Eastern States, 341 I.C.C. 622 (1972), for shifting the burden to them is misplaced since that case involved an attempt by carriers to *justify* new rates to the Commission. In such case, carriers clearly had the burden to establish that the proposed rates were not unjust and unreasonable, whereas here carriers contend that the burden is on the shippers to establish violations of §§ 2 and 3(1). See Swift & Co. v. United States, 343 U.S. 373, 72 S.Ct. 716, 96 L.Ed. 1008 (1952); Chicago & Eastern Illinois R. R. v. United States, *supra.*

■ We believe, as did the Commission, that the shippers carried their burden when they established the unreasonable practice in violation of rule 66(a) and § 1(6). This justified the shifting of the burden to the carriers. See rule 66(a)(5). The findings supporting the rule 66(a) and § 1(6) violations are also sufficient to support the findings of potential violation of §§ 2 and 3(1) by the carriers' practice of furnishing "special" cars when ordinary cars are ordered, in the absence of a carrier convenience rule.

Although the portion of the Commission's Report dealing with the §§ 2 and 3(1) violations are "of less than ideal

clarity", when read with the balance of the Report and in light of the vice sought to be remedied by the Commission, "the agency's path may reasonably be discerned" and its action must, accordingly, be upheld. *Bowman Transportation, supra,* 419 U.S. at 286, 95 S. Ct. at 442.